In the Matter of MUSKEGON MOTOR SPECIALTIES, Debtor.

MUSKEGON MOTOR STOCKHOLDERS PROTECTIVE COMMITTEE, Appellant,

v.

Louis F. DAVIS, Trustee, Appellee.

No. 16492.

United States Court of Appeals Sixth Circuit.

Sept. 29, 1966.

John R. Starrs, Detroit, Mich. (Wurzer, Higgins & Starrs, Detroit, Mich., on the brief), for appellant.

David Ferber, Washington, D. C. (Thomas B. Hart, Adm., J. Kirk Windle, Sp. Counsel, Grant Guthrie, Atty., Chicago Regional Office, S. E. C., Chicago, Ill., Philip A. Loomis, Jr., Gen. Counsel,

David Ferber, Sol., Richard Nathan, Atty., S. E. C., Washington, D. C., on the brief), for Securities and Exchange Commission.

Joseph S. Radom, Detroit, Mich. (Leonard Meldman, Detroit, Mich., on the brief), for appellee.

Maxwell F. Badgley, Jackson, Mich. (Clifford H. Domke, Jackson, Mich., of counsel), for prospective purchasers of stock.

John A. Ziegler, Jr., Detroit, Mich. (Dickinson, Wright, McKean & Cudlip, Robert E. McKean, Detroit, Mich., of counsel), for Wyman-Gordon Company, Unsecured Creditors.

Before WEICK, Chief Judge, and PHILLIPS and CELEBREZZE, Circuit Judges.

WEICK, Chief Judge.

This is an appeal by a stockholders' committee representing preferred stockholders of the Muskegon Motor Specialties Company, a Delaware corporation, (hereinafter referred to as Muskegon) from an order of the District Court approving a plan of reorganization under Chapter X of the Bankruptcy Act, 11 U.S.C. §§ 501–676 (1965) [1]. Muskegon has owned and operated the Jackson Crankshaft Division, which machines and processes crankshafts for the motor truck industry, since 1930. Since 1955, it has also owned all of the shares of stock of its subsidiary, the Detroit Brick & Block Company, which produces sand-lime bricks for residential and commercial construction in the metropolitan Detroit area. Other diversified divisions of Muskegon, acquired at various stages of its corporate life, have been sold off during the pendency of the Chapter X proceedings.

The District Court held a hearing on a plan of reorganization submitted by the Creditors Committee in December, 1964, more than three and one-half years after the commencement of the proceedings, which plan provided for exchanging shares of stock for creditors' claims, and evidence was then adduced to the effect that Muskegon was insolvent. The creditors' plan was dropped and the Trustee submitted an amended plan of reorganization. Hearings on the Trustee's amended plan were held in January, 1965, at which time additional expert testimony as to the insolvency of Muskegon and the future prospects for the reorganized Jackson Crankshaft Division (Detroit Brick & Block not being insolvent) was adduced by the Creditors Committee and the Trustee in support of the amended plan. No evidence was offered at that time by the preferred shareholders or the Securities and Exchange Commission, and the District Court entered an order finding Muskegon insolvent and approved the amended plan on January 25, 1965. Later, after the required consent of the creditors had been received, the Court confirmed the plan on March 1, 1965.

Because of the appeal from the order of January 25 by the newly-formed Stockholders Protective Committee, no steps were taken to implement the amended plan. The Committee represents holders of the Class A preferred stock of Muskegon, it being generally agreed that the common stock and Class B preferred have no interest remaining in the corporation. In June 1965, SEC moved to vacate the orders approving and confirming the amended plan because of an alleged significant change in the financial outlook of the Jackson Crankshaft Division. The District Court granted this motion on June 23, 1965. The proponents of the plan moved for a rehearing of SEC's motion to vacate. On the rehearing, which was permitted by this Court pending the appeal, additional expert testimony on the issue of solvency of Muskegon was presented in the District Court both by the Creditors Committee and, for the first time, by the Stockholders Committee. On October 25, 1965, the District Court filed an opinion and

---

1. The proceedings were originated under Chapter XI on April 12, 1961, and thereafter, on motion of the Securities and Exchange Commission, were transferred to Chapter X.

order confirming its original finding of insolvency, vacating the order of June 23, 1965, and denying the motion of SEC to vacate the orders of January 25 and March 1, 1965, approving and confirming the amended plan. SEC, by statute [2], is given no right of appeal, but it submitted briefs supporting the appeal of the Stockholders Committee and participated in the oral argument.

The Trustee's amended plan of reorganization which engendered this lengthy and complex dispute provides for the payment in full of all costs and expenses of administration, taxes, wage liabilities, claims incurred during the Trustee's operation of Jackson Crankshaft, and of all secured creditors. General unsecured creditors are given the choice of accepting 45% of the face amount of their claims in cash or 33 and 1/3% in stock of the new corporation. The interests of the old shareholders, both common and preferred, are eliminated because of the finding of insolvency. Instead, a group of local businessmen has agreed to subscribe for 20,000 of the new shares of common stock of the reorganized corporation and has placed the purchase price of $200,000 in escrow for this purpose. The remaining 12,500 new shares will be taken by the largest unsecured creditor and four smaller creditors [3] in lieu of a cash settlement of their claims. In addition, the new group has arranged a bank loan in the amount of $400,000, secured by mortgage, to finance the payments to the creditors who elected to take cash.

■■ Before the District Court can confirm a plan of reorganization under Chapter X, even one accepted in good faith by the required percentage of creditors, it must be satisfied that the plan is "fair, equitable, and feasible," 11 U.S.C. § 621. This standard, developed through the years from the prior practices of the federal courts in equity receiverships, must be applied through the exercise of independent judgment of the District Court. As a prerequisite to such a find-

ing, the court must test the plan by the rule of absolute priority; that is, the plan must preserve for each set of interests the priority which it held before the reorganization. Northern Pacific Railway Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913); Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939), rehearing denied, 308 U.S. 637, 60 S.Ct. 258, 84 L.Ed. 529 (1939). See also Marine Harbor Properties, Inc. v. Manufacturer's Trust Co., 317 U.S. 78, 63 S.Ct. 93, 87 L.Ed. 64 (1942). In most cases this means that the shareholders of the debtor corporation have no right to participate in the new corporation until all the claims of creditors have been satisfied in cash or by some other method agreeable to them. Thus, if the corporation is insolvent, if the total of its assets is less than its liabilities, then there is no room in the new corporation for the old shareholders unless they contribute fresh capital. Otherwise, they benefit at the expense of creditors who have not been satisfied commensurate with their pre-existing priorities over the shareholders.

■■ In order to measure the fairness of a plan as between creditors and shareholders, some valuation of the debtor corporation must be made to determine the issue of solvency or insolvency and so provide a guide for the apportionment of interests in the new reorganized business. Consolidated Rock Products Co. v. Du Bois, 312 U.S. 510, 524, 61 S.Ct. 675, 85 L.Ed. 982 (1941). Although property may be valued in several ways, the courts have long held that earning capacity, the capitalization of future profits, is the appropriate method of valuation in connection with Chapter X proceedings. Consolidated Rock Products Co. v. Du Bois, supra at 526, 61 S.Ct. 675. This is because the very purpose of Chapter X is to preserve the going concern value of a business through the continuation of operations, and so avoid the uneconomic expedient of a forced sale of the assets.

---

2. 11 U.S.C. § 608.

3. The names of these four creditors and the amounts of their claims are not shown in the record filed in this Court.

▓▓▓ The sole issue that emerges here from the welter of charts, projections, audits, appraisals, expert opinion, and other evidence is the propriety of the District Court's determination that Muskegon was insolvent. Insolvency was a question of fact to be determined by the District Court from all of the evidence. We do not hear this case de novo. Our function is only to determine whether the order of the District Court finding Muskegon insolvent is supported by substantial evidence. We have no right to disturb it unless we find it to be clearly erroneous, Rule 52(a) Fed.Rules Civ. Proc.; nor need we pass upon the fairness of the plan with respect to creditors, since they have approved it and it was not questioned either in the District Court or here. The problem involved in determining the issue of solvency is emphasized by the judgmental character of valuation by future earning capacity and the divergent assumptions and conclusions expressed not only by the opposing parties, but also among various experts who testified in the case. We hold that, on the record before us, the District Court's determination of insolvency, in his carefully prepared opinion, was supported by substantial evidence and is not clearly erroneous.

▓▓▓ In bankruptcy, a finding of insolvency is arrived at by a comparison of the assets (here being the capitalized value of future earnings) with liabilities. The calculation of either of these factors will thus affect the final determination. In its turn, each of these elements is a function of other calculations and projections which in this case were the subjects of extensive expert testimony and are not the outcome of mere mathematical calculation.

▓▓▓ The capitalized value of the business is a function of its estimated average annual future earnings and the rate of capitalization, or "multiplier". The earnings base is itself determined by two factors: projected future sales and the estimated profit margin on those sales. The plan proponents presented several witnesses with various appraisals of Jackson Crankshaft. Chief among these were Dr. DeSpelder and Mr. Welling. The shareholders presented the testimony of Mr. Taylor. Mr. Taylor was the only witness who ever found the company to be solvent—Welling, DeSpelder, and other witnesses offered by the proponents of the plan found insolvency, though to different degrees. Muskegon was also insolvent by a wide margin in the two appraisals ordered by the Court. As on all other relevant factors, these witnesses differed, and it is instructive to examine and compare their findings and opinions.[4]

Both Welling and Taylor used the same projected sales figures in ascertaining

4. The proponents of the amended plan presented several other witnesses in addition to DeSpelder and Welling. In general, witnesses Sanders and Wade, both CPA's, corroborated Dr. DeSpelder's opinion on the going concern value of the Jackson Crankshaft Division. Mr. Nicholson, an investment banker, used multipliers similar to those of DeSpelder, Sanders, and Wade, but projected a much lower earnings base ($112,000) and so found a value of only $448,000 for the crankshaft business. Finally, Mr. Zick, who testified at the summer hearings along with Mr. Welling, used a multiplier of 5 and found a value of only $389,000 for Jackson Crankshaft. Thus, every witness called by the proponents found Muskegon to be insolvent.

The District Court appointed two appraisers to value the physical assets, based on a premise of liquidation rather than reorganization. These witnesses, Legg and Horton, together found a valuation of $634,980 at forced sale and $805,044 at fair market for the land, buildings, machinery and equipment of Jackson Crankshaft Division. Apparently, no discount factor was applied to the value of the accounts receivable in the Trustee's balance sheets, despite the fact that they, too, might decline drastically in value if the company were to be liquidated rather than reorganized and continued. Although a liquidation valuation is not the proper method for determining solvency in reorganization hearings, and was not so used here, the high degree of insolvency that these figures reveal makes the need for an equitable reorganization all the more clear so as to avoid further damage to the interested parties.

average pre-tax earnings for the next five years in the crankshaft business. Their results differed solely because Welling adopted an average profit rate of 6% of sales, while Taylor allowed a 7.7% rate of profit on those same sales. As the District Court pointed out, Welling's figure seems more realistic in view of the past history of the company. Moreover, Mr. Taylor arrived at his figure by dropping the high and low profit years from the period 1961–65 and averaging the remaining three years. In so doing, he eliminated the very low (1.4%) figure for the year 1964. This omission is particularly significant since the low profits of 1964 were the result of a risk inherent in Muskegon's crankshaft business. In fact, it sustained heavy losses imposed on it that year due to unexpected demands for added production by the Ford Motor Company, a customer which accounts for 50% of Muskegon's crankshaft business. Because of the need to satisfy Ford on short notice in order to retain its business, unskilled workers had to be hired and inefficient plant operation was required, with resulting high costs and low profits. (It should also be noted that Mr. Taylor contended for a very high multiplier, which again disregards the risk stemming from Muskegon's heavy dependence on the Ford business—thus, in effect, twice eliminating this important factor from his appraisal.)

Dr. DeSpelder estimated an average net profit over the next five years of $280,000, more than double Mr. Welling's estimate of $136,980 and more than 50% above Mr. Taylor's figure of $175,451. He differed with Taylor and Welling in applying a projected sales rate of approximately $500,000 more per year and in using a profit rate of 7% for the crankshaft business. It is illuminating to note that if Dr. DeSpelder's assumed net pre-tax profit is applied to the sales figures used by Mr. Taylor, the resulting estimate of profit rates differs by only 0.1%, yet Dr. DeSpelder found insolvency while Mr. Taylor found solvency.

The chief controversy in this case, however, does not center on the varying estimates of projected earnings, divergent as they may be. Rather, it focuses on the rate of capitalizing those earnings, the so-called "multiplier". This figure is a rough estimate of the risk figure inherent in a particular business. All of the witnesses presented by the plan's proponents agreed that a figure of 5 or less was the appropriate multiplier for the crankshaft business, indicating an expected return of 20% on investment. Mr. Taylor, however, applied a multiplier of 9.1 to his estimated earnings base and this was the main factor in his high valuation of the Jackson Crankshaft Division.

The proponents' witnesses arrived at a multiplier of 5 through an independent analysis of the risks in the character of the crankshaft business and the particular situation of Muskegon. Some of the factors on which they relied were the cyclical nature of the truck industry in general; the fact that Muskegon supplied only labor for one product and had no other; the fact that it had only about seven customers; the dependence of Muskegon on one large customer which might decide to begin producing its own crankshafts or otherwise disrupt Muskegon's profits as in 1964; the age and condition of the plant and equipment; and possible uncertainties in management, expenses and operations.[5] Mr. Taylor, on the other hand, arrived at his 9.1 estimate of appropriate capitalization by mere mathematical calculation of the price-earnings ratios of a group of selected auto parts manufacturers listed on the stock exchange. The District Court rejected this sole de-

---

5. An additional risk factor, probably accounted for in the witnesses' earnings projections, rather than the multiplier factor, is the necessity of funding Muskegon's large deficiency in contributions to its employees' pension funds. In order to make up these deficiencies, maintain current payments, and meet future increases that may be negotiated by the unions, Muskegon will experience a heavy drain on its income for many years to come. This is virtually a fixed cost as far as the amortization of past deficiencies is concerned and constitutes one of the major risks being assumed by the new owners.

pendence on stock market data, and we agree.

■ Two factors lead to this rejection. First, of the 36 companies used by Mr. Taylor in his computations, few if any can be considered comparable to Muskegon. None had sales in 1964 of less than four times Muskegon's sales of that year and some had more than 100 times its sales. Certainly a simple, unqualified or unadjusted calculation made from these figures cannot be accepted at face value. Second, we cannot sanction the direct application of ratios derived solely from the stock market in the valuation of a small, unlisted company with no market for its shares. While the price-earnings ratios of the larger companies in the same industrial grouping may be considered as relevant evidence to some extent, they cannot serve as a sole guide to value under the guise of infallible "market judgments". As the District Court rightly emphasized, the stock market is daily influenced by factors of a speculative or emotional nature that do not necessarily enter into a realistic evaluation of long-run economic values. The pressure of fads and rumors often causes distortions in price ratios which should not be considered in a careful long-term valuation. Thus, even though Mr. Taylor could have referred in part to stock market figures, they cannot be accepted as the sole determinant of value here.

Further, if Dr. DeSpelder's figures are once again adjusted for comparison with Mr. Taylor's, we find there is less difference than appears on the surface. Thus, if DeSpelder's total valuation of $1,400,000 is superimposed on Taylor's earnings base of $175,451, it appears that a multiplier of 8 results. This means that if DeSpelder had used the same earnings base as Taylor, he would have chosen a multiplier very close to Taylor's. Since risk estimates are inherent both in the earnings base estimates (as to projected sales and profit rates) and in the calcu-

lation of the multiplier, as we noted in regard to the 1964 Ford order, it is apparent that in their overall appraisals of the risks and value of the Jackson Crankshaft Division, Taylor and DeSpelder differed very little. This is demonstrated by the proximity of their total appraised values: DeSpelder—$1,400,000; Taylor —$1,596,604.

The other main appraisal, that of Mr. Welling, differed substantially from either of these two. Mr. Welling found a going concern value for the Jackson Division of only $684,900. This was the natural result of his use of lower sales, profit, and multiplier figures all in the same estimate. There is no correspondingly high counter-appraisal to balance Mr. Welling's figures.[6] Thus, the District Court would have the right to decide that although Taylor and DeSpelder were in substantial agreement on the value of the crankshaft business, DeSpelder's appraisal was the more reliable. If Taylor had used Welling's lower profit rate and earnings base, thus accounting for the Ford risk factor illustrated in 1964, as a counterbalance to his high multiplier, his valuation would actually fall below that of Dr. DeSpelder—$1,246,518.

■ Before turning to the other element of the Muskegon valuation, the going-concern appraisal of the wholly-owned Detroit Brick subsidiary, it may be helpful to focus on the other factor in the finding of insolvency, the liabilities. A miscalculation of liabilities can be as damaging as an error in valuation of assets. However, here, despite appellants' contention, the District Court correctly found that the debtor corporation's liabilities totalled $1,350,000 exclusive of accrued interest and administrative expenses. This figure is in substantial agreement with that contended for in the brief of SEC and appears both in the order confirming the plan on March 1, 1965,[7] and in the opinion on the motion for rehearing dated October 8, 1965. The expenses

---

6. See footnote 4, supra.

7. The figure which appears in paragraph 4 of the order of March 1, 1965, is ac-

tually $1,260,150.78. However, this is exclusive of secured debts then owing.

of the Chapter X administration since 1961 will total approximately $200,000, as all the parties agree. Since the determination of liabilities is being made with the continuation of the business in mind, the statutory interest accruing on the creditors' claims must also be considered as a liability before any interest is allocated to the stockholders. Otherwise, the creditors would be denied their "absolute priority". A finding of solvency would necessitate the payment of interest at the statutory rate, so that accrued amount must be considered in determining solvency. Ruskin v. Griffiths, 269 F.2d 827 (2d Cir. 1959) cert. denied 361 U.S. 947, 80 S.Ct. 402, 4 L.Ed.2d 381 (1960). This accrual totals at least $300,000 and makes the total liabilities of Muskegon at least $1,850,000 exclusive of a contested tax claim of more than $42,000. The SEC estimated liabilities on July 1, 1965 at $1,923,294.[8]

Thus, with liabilities of between $1,-850,000 and $1,900,000 the District Court would have had to find a value of at least $450,000 for the Detroit Brick & Block Company subsidiary in order to find solvency using Dr. DeSpelder's estimate of the Jackson Crankshaft Division ($1,400,000) or, using Mr. Taylor's valuation ($1,596,604), at least $253,396. According to Mr. Welling's estimate, solvency would be almost impossible to find, since Detroit Brick would have to be worth more than the Jackson Division in order for their total value to equal or exceed the liabilities.

It is apparent that on the key issue of solvency the valuation of Detroit Brick & Block assumes special importance. Dr. DeSpelder, using an earnings base of $77,700 and a multiplier of 4, found a going-concern value of $310,800. Mr. Taylor, however, arrived at a figure of $521,820, based on an estimated earnings base of $44,600 and a multiplier of 11.7.[9] If Mr. Taylor's earnings projection is used for both totals, thus focusing all risk and economic judgments on the choice of the multiplier or rate of capitalization, it will be seen that Dr. DeSpelder would have used a multiplier of almost 7, rather than 4.

The main difference between DeSpelder and Taylor here is the high multiplier applied by Taylor. He testified that it was calculated by computing the price-earnings ratios of two comparable brick supply companies. However, it is clear that this mathematical operation alone cannot justify the use of such a high rate of capitalization, especially in the face of other evidence and the testimony of other equally qualified experts. First, there is some evidence that offers of $175,000 and $200,000 have been tendered for the purchase of the brick company in the recent past. Although these are by no means conclusive of full value, they are at least some evidence of what it would bring on the market. Second, the earnings records of Detroit Brick & Block show that over the past 18 years, it has sustained substantial losses in eight years and earned a profit in only ten. The net average annual pre-tax profit for the company was only $14,341, far below even Mr. Taylor's low projection of $44,600 after taxes.[10] Finally, the brick company is tied to its customers in the construction industry and shares their fortunes in that volatile and cyclical business, a factor which hardly justifies assigning it a multiplier higher than that used for Jackson Crankshaft in the auto parts industry. Considering all these factors, it cannot be said that the District Court's failure

---

8. If $31,019 of liabilities of the defunct Ridge Sales subsidiary is also included, the Court's finding almost exactly matches that of the SEC.

9. Of the other witnesses, Mr. Nicholson found a going-concern value for Detroit Brick of approximately $200,000 and Mr. Zick estimated a liquidation value of $230,000 after finding a going-concern value of only $74,635. The Legg-Horton liquidation appraisal of the physical assets of Detroit Brick showed $191,974 at fair market value and $152,525 at forced sale.

10. If post-tax figures were used for the average annual profit 1948–65, thus making a more accurate comparison, the difference between Taylor's projection and the actual earnings history would be even greater.

**530**

to accept and adopt Mr. Taylor's valuation *in toto* was wrong.

This extensive review of the complex and conflicting evidence presented during the course of the hearings on solvency reveals one fundamental fact: the District Court would have had to accept each and every contention of the appellants at full face value in order even to approach a finding of solvency. The District Judge saw and heard the testimony of all of the expert witnesses and was in a much better position to pass upon their credibility than we are. He was familiar with the proceedings and the affairs of Muskegon. If any weight whatever is given to the voluminous evidence presented by the proponents of the plan of reorganization, then substantial support for the finding of insolvency is provided. In such a situation, the finding of insolvency can in no way be deemed clearly erroneous under Rule 52(a). Dudley v. Mealey, 147 F.2d 268 (2d Cir. 1945) cert. denied 325 U.S. 873, 65 S.Ct. 1415, 89 L.Ed. 1991 (1945); In re Plankinton Building Co., 148 F.2d 119 (7 Cir. 1945) cert. denied Harvey v. Grossman, 326 U.S. 729, 66 S.Ct. 36, 90 L.Ed. 433 (1945). The valuation of a business remains an art based on the use of informed, careful judgment (including that of the court), and it cannot be expected to yield mathematically precise results. Consolidated Rock Products Co. v. Du Bois, supra, 312 U.S. at 526, 61 S.Ct. 675.

The unsecured creditors, most of whom elected to take cash, have already been delayed for more than five years in realizing on their claims. These creditors are satisfied with and have approved the plan of reorganization and are resisting the efforts of the preferred shareholders to share in the assets and further delay the closing of the estate.

Although the unsecured creditors are not being made whole either in cash or stock and could not be so compensated in the reasonable future, the preferred shareholders still think that some provision should have been made in the plan for them to share in the assets of the debtor. They all had the opportunity to participate in the reorganized company by putting up some new money, but they declined to contribute anything to its capital. Instead, the preferred shareholders are complaining about the alleged unconscionable bargain the group of local businessmen will receive for their $200,000 investment, even though the shareholders declined to invest in the reorganized company. The shareholders paint a rosy picture about the prospects of the reorganized company over the next five years, but this fails to take into account that the investors could lose their money in the event of a business recession, strikes and labor stoppages in the reorganized company or in the plants of their customers, or other adverse conditions. The shareholders ought not to be permitted to gamble on the future of the reorganized company with the money owing to creditors that is so long past due.

For these reasons, the judgment of the District Court is affirmed.