**In re CROSSCREEK APARTMENTS, LTD., E.I. # 62–1196821, Debtor.**

**Bankruptcy No. 96–20170.**

United States Bankruptcy Court,
E.D. Tennessee.

Sept. 26, 1997.

Thomas E. Cabaniss, Patrick L. Hayden, McGuire, Woods, Battle & Boothe, L.L.P., Norfolk, VA, for Walter F. Trent and Lynwood G. Willis.

Thomas A. DuBose, Chattanooga, TN, for Ellen B. Vergos, U.S. Trustee for Region 8.

Fred M. Leonard, Bristol, TN, for Crosscreek Apartments, Ltd.

Randal S. Mashburn, Baker, Donaldson, Bearman & Caldwell, P.C., Nashville, TN, for Condor One, Inc.

## MEMORANDUM

MARCIA PHILLIPS PARSONS,
Bankruptcy Judge.

This single asset case presents competing chapter 11 plans, one of reorganization proposed by two general partners of the debtor, Walter F. Trent and Lynwood G. Willis (collectively, the "Partners"), and the other, a

liquidation plan, proposed by Condor One, Inc. ("Condor"), the debtor's only secured creditor. Pursuant to orders entered March 4, 1997, a confirmation hearing was held on May 22, 1997, upon Condor's third amended plan and the Partners' third amended plan, both filed on February 25, 1997, and the respective objections thereto filed by the Partners and Condor on April 30 and May 1, 1997.[1] For the following reasons, the court will confirm Condor's plan, to be amended in conformance with this opinion, and deny confirmation of the Partners' plan as they are incapable of proposing a confirmable plan. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(L).

## I. BACKGROUND

The debtor, Crosscreek Apartments, Ltd., is a Tennessee limited partnership[2] formed for the purpose of owning, constructing and operating Crosscreek Apartments, a 280–unit apartment complex built in 1985 and located on 25.83 acres of land in Kingsport, Tennessee. Condor holds a promissory note and supplemental promissory note in the respective original principal amounts of $8,384,-300.00 and $750,000.00, secured by a deed of trust and supplemental deed of trust on debtor's realty and a security agreement and modified security agreement covering the debtor's chattels (collectively, the "loan documents"), all of which originated with First American National Bank of Knoxville, Tennessee, in connection with a FRA insured mortgage loan obtained by the debtor. The loan documents were subsequently assigned to the Secretary of Housing and Urban Development ("HUD") in April 1989, who sold and assigned HUD'S interests therein to Condor in May 1995.

The debtor filed the petition initiating this case on February 1, 1996, after failing to obtain a state court temporary injunction prohibiting Condor from conducting a foreclosure sale of the apartment complex scheduled for that same date. As of the bankruptcy filing, the debtor owed Condor approximately $10.8 million, consisting of principal and interest in the respective amounts of $9.1 million and $1.7 million. The debtor has continued to operate the apartment complex as a debtor in possession under 11 U.S.C. §§ 1107(a) and 1108.[3]

Shortly after the bankruptcy filing, the court conducted a hearing on April 23, 1996, on a motion for relief from the automatic stay filed by Condor wherein Condor argued that the stay should be lifted because the debtor had no equity in the apartment complex and was incapable of proposing a confirmable reorganization plan.[4] Unwilling to accept a plan which paid it less than the full amount of its claim and anticipating a cramdown by the debtor, Condor reasoned that it would be able to control the voting of the class of unsecured creditors by virtue of the amount of its unsecured claim, estimated at

---

1. Two days before the confirmation hearing, the Partners filed a modification to their third amended plan of reorganization wherein they amended the proposed treatment of Condor's secured and unsecured deficiency claims contained in *Classes Two* and *Five*, respectively. Condor did not object to the court's consideration of this modification.

2. *Exhibit 7* to the Partners' third amended plan indicates the partnership comprises four general partners, collectively owning 1.1 percent of the debtor, and forty-eight limited partners who own the remaining 98.9 percent.

3. On March 5, 1996, an agreed order was entered between the debtor and Condor allowing the debtor use of Condor's cash collateral, *i.e.*, pre and postpetition rents, and providing adequate protection of Condor's interest therein, including, *inter alia*, a transfer from the debtor to Condor of $227,872.86 of rent proceeds held by the debtor and future monthly payments of $75,-957.62 during the pendency of the case.

4. The court also considered at that hearing the debtor's motion to assume a "Provisional Workout Arrangement" ("PWA") which the debtor had entered into with HUD in November 1993. In an order entered April 29, 1996, the court denied the motion, finding that the PWA had been effectively terminated by Condor prior to entry of the order for relief and could not be assumed by the debtor under 11 U.S.C. § 365. Specifically, the court found that Condor had cause to terminate the PWA because of the debtor's defaults thereunder in failing to make monthly payments of excess cash flow exceeding $49,000.00 and to submit monthly operating reports to Condor. Alternatively, the court concluded that the PWA constituted a contract for financial accommodations for the benefit of the debtor, which was barred from assumption under 11 U.S.C. § 365(c)(2).

that time to be $3.8 million, and, as a result, the debtor would not be able to obtain the affirmative vote of at least one impaired class of claims as required for confirmation by 11 U.S.C. § 1129(a)(10). The only other avenue for the debtor, Condor asserted, was to place Condor's unsecured claim in a separate class from those of the other unsecured trade creditors. Condor argued that classification in this manner was impermissible, however, as a majority of circuit courts had so held.

Although the Sixth Circuit Court of Appeals had not expressly ruled on classification of a unsecured deficiency claim in the context of a single asset real estate case, the court nonetheless concluded that the Sixth Circuit would likely allow separate classification in this instance considering its decision in *Teamsters v. U.S. Truck Co. (In re U.S. Truck Co.)*, 800 F.2d 581 (6th Cir.1986); along with the subsequent bankruptcy cases of *In re Rivers End Apartments, Ltd.*, 167 B.R. 470, 478–79 (Bankr.S.D.Ohio 1994), *In re Creekside Landing, Ltd.*, 140 B.R. 713, 715 (Bankr.M.D.Tenn.1992), and *In re Aztec Co.*, 107 B.R. 585, 587 (Bankr.M.D.Tenn.1989), all of which similarly concluded *U.S. Truck* provided precedent for allowing separate classification of an unsecured deficiency claim in a chapter 11 single asset real estate case. Having no success with that argument, Condor asserted that even with separate classification of the unsecured deficiency claim, the debtor had not shown a realistic prospect of reorganization. Because the debtor was still within its exclusivity period for filing a plan, the court concluded that the evidence offered by the debtor was not so insignificant to suggest no realistic possibility of reorganizing. Accordingly, by order entered April 29, 1996, Condor's motion for relief from stay was denied.

On June 13, 1996, the court conducted a hearing on the debtor's amended motion to extend its 120–day exclusivity period for filing a plan for an additional sixty days from May 31, 1996, and Condor's objection thereto. Because the court did not find sufficient cause to extend the exclusivity period, the motion was denied by order entered June 18, 1996. That led to the filing of competing plans by Condor and the Partners and a parallel course of proceedings related to approval of their disclosure statements and plan confirmation.

Condor's first disclosure statement and plan were filed on September 13, 1996. The Partners filed their first disclosure statement and plan on October 3, 1996. A hearing on the adequacy of information contained in those disclosure statements was initially scheduled for November 4, 1996. However, in light of objections filed by the U.S. Trustee to both disclosure statements and Condor's and the Partners' objections to the other's disclosure statement, the parties requested a telephonic scheduling conference which was conducted on October 31, 1996. During that scheduling conference, counsel for Condor and the Partners requested, *inter alia*, that the court value the apartment complex as a part of the disclosure statement hearing since the Partners asserted in their disclosure statement that the value was $7.6 million, while Condor maintained in its disclosure statement that the value of the apartment complex was between $8.86 million and $9.5 million. Accordingly, the court set deadlines for conducting discovery and for filing amended disclosure statements in light of the pending objections, and continued the disclosure statement hearing until December 20, 1996. On December 6, 1996, Condor and the Partners filed amended disclosure statements and plans. Again, both Condor and the Partners filed objections to the other's amended disclosure statement and the U.S. Trustee renewed her objections to both amended disclosure statements. Upon the parties' request, the hearing on December 20, 1996, focused solely upon the value of the apartment complex. On January 17, 1997, the court filed a memorandum opinion finding the value of the apartment complex to be $8.2 million and entered an order sustaining the objections of Condor and the Partners to each other's first amended disclosure statement in this regard.

After filing second amended disclosure statements and plans on January 27, 1997, Condor and the Partners again filed objections to the other's second amended disclosure statement. The U.S. Trustee did not object to the second amended disclosure

statements. On February 12, 1997, a hearing was conducted upon the second amended disclosure statements, whereupon the court sustained and overruled various objections by both parties and set a deadline for filing amended disclosure statements in accordance with the court's rulings. Condor and the Partners filed their third amended disclosure statements and plans on February 25, 1997, and orders approving both disclosure statements were entered on March 4, 1997. Not unexpectedly, Condor and the Partners then objected to the other's plan. At their request, the parties were provided a period of time for discovery to be taken in preparation for the final confirmation hearing upon their third amended plans.

## II. PARTNERS' PLAN

The Partners' third amended plan of reorganization classifies claims and interests into six classes. *Class One* consists of priority claims against the debtor and includes the security deposits of the tenants of the apartment complex in the approximate amount of $65,000.00.[5] Security deposits which are payable pursuant to lease terms prior to the effective date of the plan, *i.e.*, the 30th day, which is a business day, after the order confirming the plan becomes final, will be paid in full on or before the effective date. Those security deposits that will become due and payable after the plan's effective date will be paid in full when due pursuant to the terms of the particular lease. This is the only class that the Partners deem unimpaired by their plan.

Condor's claim which is secured by a first lien upon the debtors' realty, prepetition cash, accounts receivables, and other personalty[6] is bifurcated into two claims by the

Partners' plan, an allowed secured claim of Condor contained in *Class Two* and an allowed deficiency claim contained in *Class Five*. The allowed secured claim in the amount of $8,358,000.00[7] is to be paid in full by the remittance of prepetition cash (less a $10,000.00 retainer to debtor's counsel) to Condor on the effective date, the payment of $100,000.00 from a new equity fund on the effective date, and the remainder, in the principal amount of $8,155,000.00, by deferred payments under a new secured, nonrecourse plan note to replace the current notes held by Condor as a part of its loan documents. That proposed new plan note will provide for equal monthly payments of principal and interest in the following manner: seventy-five percent of the principal amount will bear interest at a simple annual interest rate equal to 160 basis points over the 14–year treasury bill rate on the date of the confirmation hearing (6.83%), *i.e.*, 8.43%, based upon a thirty-year amortization; and the remaining twenty-five percent of the principal amount will bear interest at a simple annual interest rate equal to 260 basis points over the 14–year treasury bill on the date of the confirmation hearing, *i.e.*, 9.43%, based upon a twenty-year amortization. The full remaining balance of the plan note will be payable on the date which is ten years after the plan's effective date. Condor will retain all liens securing its claims, but such liens will be limited to secure only the amount of its allowed secured claim less all payments thereon as provided by the Partners' plan. Upon payment to Condor of the amount of its allowed secured claim, all of Condor's liens upon the realty and personalty will be discharged and released.

The unsecured deficiency portion of Condor's claim contained in *Class Five* is esti-

---

**5.** Priority claims are defined in the Partners' plan as claims "made pursuant to § 507(a)(3), § 507(a)(4), § 507(a)(5), § 507(a)(6) or § 507(a)(7) of the Code." Conspicuously absent from this definition are administrative expenses allowed under 11 U.S.C. § 503(b) which are entitled to priority under § 507(a)(1). Administrative expenses are not included in any class although *ARTICLE III* of the Partners' plan does provide for their payment.

**6.** The Partners do not concede that Condor's lien on certain personalty valued by the Partners at

$40,000.00 is perfected because of Condor's alleged failure to file UCC–1 continuation statements prior to the bankruptcy filing. For the purposes of their plan, however, the Partners deem Condor to have a properly perfected security interest in that personalty.

**7.** Although not specified in the plan, it appears that this amount includes the apartment complex valued at $8.2 million, prepetition cash of $113,000.00, accounts receivable of $5,000.00 and $40,000.00 in personalty.

mated to be $1,075,000.00 as of the effective date of the plan. This claim will be paid in full without interest over the life of the plan by payment to Condor of 90% of the annual net cash flow from the apartment complex, i.e., the amount of funds remaining after the payment of all expenses of the apartment complex including the required debt service to Condor or any other lender, with such payments to begin on January 31 of the year following the plan's effective date. Ten years after the effective date of the plan, the full remaining balance of the claim at that time, estimated by the Partners at $176,-217.00, will be paid in full and final satisfaction of Condor's deficiency claim.

Class Three consists of all creditors holding general allowed unsecured claims against the debtor except for the claimants in Classes Four and Five. Claims in this class in the approximate amount of $26,000.00 will be paid fifty percent in cash on the plan's effective date and fifty percent in cash 180 days after the effective date, without interest. Class Four consists of the debtor's obligations to its general partners, Walter F. Trent, Lynwood G. Willis, and Bruce W. Grewell, in the approximate amount of $728,-000.00. These class members will retain all rights to payment of their claims as they exist under the partnership agreement, subject to any rights of offset; provided, however, that the right to payment is subordinated to payment in full of the Class Five deficiency claim of Condor.

Under Class Six, all equity security holders of the debtor will retain their respective partnership interests in the debtor only to the extent that they contribute at least their pro rata share to a new $170,000.00 equity fund. The pro rata share is determined by the percentage interest of each such equity security holder and those who contribute retain their status as general or limited partners as those interests existed prepetition. The interests of those equity security holders who do not contribute their pro rata share

will be extinguished on the plan's effective date and their partnership interests will be forfeited, on a pro rata basis, to the equity security holders who do contribute to the new equity fund. To the extent that a sufficient number of equity security holders do not elect to contribute to the new equity fund to raise the specified $170,000.00, the balance will be funded by the Partners.

■ The summary of ballots cast accepting or rejecting the Partners' third amended plan filed on May 15, 1997, indicates that Classes Two and Five containing Condor's secured and unsecured deficiency claims, respectively, rejected the plan. Classes Three and Four containing the general unsecured trade claims and insider claims, respectively, accepted the plan along with Class Six which contains the partnership interests in the debtor. Because Class One is unimpaired, the holders of claims therein are conclusively presumed to have accepted the plan. See 11 U.S.C. § 1126(f).

Condor asserts objections to confirmation of the Partners' third amended plan not only with respect to its secured and unsecured claims in Classes Two and Five, but also in its capacity as assignee of four unsecured trade claims in Class Three which were purchased for 100 cents on the dollar by Condor.[8] Condor contends that the Partners' third amended plan is unconfirmable because (1) the plan separately classifies Condor's unsecured deficiency claim in Class Five while the debtor's unsecured trade claims are classified in Class Three, in violation of 11 U.S.C. § 1122(a); (2) the Partners' plan unnecessarily rejects the debtor's prepetition apartment management contract with American Apartment Management Company and includes its prepetition claim of $18,041.55 in Class Three for the alleged improper purpose of facilitating acceptance of the plan by Class Three claimants; (3) in order to obtain an accepting impaired class of claims, the Partners artificially impaired Class Three by de-

---

8. The Partners sought to have the votes cast against its third amended plan by Condor as assignee of these four unsecured trade claims designated as not having been cast in good faith under 11 U.S.C. § 1126(e). The court's memorandum opinion on this issue was filed August 19, 1997, and by order entered that same day the Partners' motion was denied for the reasons contained in that memorandum. See In re Crosscreek Apartments, Ltd., 211 B.R. 641 (Bankr. E.D.Tenn.1997).

laying payment of fifty percent of the unsecured trade claims therein until 180 days after the plan's effective date; (4) the plan does not meet the requirements of 11 U.S.C. § 1129(a)(7) because Condor will not receive or retain property of a value, as of the plan's effective date, that is at least equal to what it would receive in a chapter 7 liquidation in light of the below market interest rate on Condor's secured claim, the lack of any interest on the unsecured deficiency claim, and the failure of the plan to provide for the recovery and distribution of monies for which the debtor's general partners are liable; (5) the plan is not feasible as required by § 1129(a)(11); (6) the plan unfairly discriminates against Condor's unsecured deficiency claim in *Class Five* in violation of § 1129(b)(1) by paying Condor less than what is being received by the unsecured trade claimants in *Class Three*; (7) Condor's secured claim will not receive the treatment required by § 1129(b)(2)(A) due to an inappropriate interest rate, due date and amortization period; (8) Condor's unsecured deficiency claim will not receive the treatment required by § 1129(b)(2)(B) because the plan violates the absolute priority rule by paying an insufficient amount, without interest and certainty of payment, and because the plan does not provide for adequate new value in exchange for the partnership interests being retained and otherwise does not subject the investment process to market forces to determine if others would pay more; and (9) the plan has not been proposed in good faith as required by § 1129(a)(3) considering the admitted breach by the plan proponents of an operating deficit agreement with the debtor and their alleged fiduciary duties to the debtor in this regard, and otherwise because the plan improperly classifies claims, unfairly discriminates against Condor's unsecured deficiency claim, and artificially impairs a class

to obtain the affirmative vote of an accepting impaired class.

### III. CONDOR'S PLAN

Condor's third amended plan of liquidation classifies claims and interests into four classes, all of which are impaired. *Class 1* comprises all unsecured claims, other than priority, administrative and those claims in *Classes 2* and *3*. If the court determines that *Class 3* claims are disallowed or subordinated, *Class 1* claims will be paid in full in cash on the later of (1) the plan's effective date, *i.e.*, the first business day which is at least eleven days after the confirmation date, or as soon thereafter as possible; (2) within thirty days of the date that a *Class 1* claim is allowed by final order; or (3) within thirty days of entry of an order by the court disallowing *Class 3* claims in their entirety or subordinating them to *Class 1* claims. If the court allows *Class 3* claims and determines that they cannot be subordinated to *Class 1* claims, then *Class 1* claims will be paid *pro rata* with *Class 3* claims from the funds that would have been used to pay *Class 1* claims in full within thirty days of such determination by the court.

*Class 2* contains Condor's claim, deemed allowed in the amount of $10,805,397.00 as of February 1, 1996, and in satisfaction thereof, all legal and equitable interests in Condor's collateral, *i.e.*, the apartment complex, related personalty, cash and accounts receivable, will be transferred by the debtor to Condor free and clear of all liens, other than Condor's liens and any lien for property taxes, and thereafter the collateral shall be solely the property of Condor. Also in satisfaction of Condor's claim, the debtor will be required to transfer to Condor free and clear of all liens all other property of the debtor [9] including debtor's general intangibles, accounts, claims, personalty, and causes of actions with the exception of those the debtor may have

---

9. In its memorandum in opposition to the Partners' plan and in support of its own plan, Condor states that it knows of no assets of the debtor which are not Condor's collateral with the possible exception of the $40,000.00 in personalty, the lien on which may be subject to avoidance due to Condor's alleged failure to file UCC–1 continuation statements. *See supra*, note 6. In response to the Partners' assertion that this provision allows Condor to receive more than it would receive in a liquidation, Condor has stipulated that it will amend its plan to provide that if its lien against that personalty is avoided for any reason, Condor will at its option pay the bankruptcy estate $40,000.00 for the personalty or such amount as may be established by an independent appraiser appointed by the court, or permit the personalty to be sold at public auction.

against the general partners. Within thirty days after the effective date of the plan, however, Condor may waive in writing this latter provision and such property will be deemed vested in the debtor as of the effective date. Condor will also receive any money remaining in the distribution fund for payment of administrative expenses and claims after all other payments from the fund have been made.

*Class 3* comprises the claims of Walter Trent, Lynwood Willis and Bruce Grewell, general partners of the debtor. Condor will seek to have these claims subordinated to *Class 1* claims based upon contractual or equitable subordination. If the claims are disallowed or subordinated, they shall receive no distribution. If the claims are allowed and not subordinated, these claims will share *pro rata* with *Class 1* claims in the funds which would have been used to pay the *Class 1* claims in full. *Class 4* comprises all the equity interests in the debtor. Such holders will retain their interests in the debtor unless *Class 3* claims are allowed and not subordinated, resulting in unsecured claims being paid less than in full, in which event *Class 4* interests will be extinguished.

Condor's ballot summary filed on May 15, 1997, indicates that *Classes 1, 3* and *4* containing the general unsecured trade claims, the insider unsecured claims, and the partnership interests in the debtor, respectively, all rejected Condor's third amended plan. *Class 2* containing Condor's secured claim accepted the plan.

The Partners object to confirmation of Condor's third amended plan, asserting that (1) the plan fails to comply with § 1129(a)(1) because it improperly classifies the Partners' unsecured claims in *Class 3* instead of in *Class 1* with the debtor's unsecured trade claims in violation of § 1122; (2) the plan violates 11 U.S.C. § 1123(a)(2) [10] because Condor's allowed secured claim is not designated as being unimpaired; (3) the plan improperly allows Condor's claim to the full extent of the prepetition amount rather than at the value of the property and otherwise does not comply with 11 U.S.C. § 506(a)

because it fails to take into account the postpetition payments by the debtor; (4) the plan was not proposed in good faith as required by § 1129(a)(3) because Condor attempted to purchase unsecured trade claims in order to prevent consideration of the Partners' plan and because Condor is attempting to circumvent 11 U.S.C. § 362(d) to obtain its collateral; (5) the plan does not meet the best interests requirement of § 1129(a)(7)(A) because the Partners and the unsecured creditors would receive more in a chapter 7 than they will under Condor's plan; (6) Condor's plan does not comply with § 1129(a)(10) which requires acceptance of the plan by at least one impaired class because *Class 2*, the only class accepting Condor's plan, is unimpaired; and (7) the plan is not fair and equitable and unfairly discriminates against the Partners' unsecured claims in violation of § 1129(b)(1) and (2) because equity holders in *Class 3* may retain their interests while the Partners' claims in *Class 4* will receive nothing, the plan provides for a conveyance of all of debtor's property to Condor which effectively forces the debtor to cease operations, and the plan conveys the property to Condor without exposing the property to the market.

The Partners' remaining objections to Condor's third amended plan that it violates 11 U.S.C. § 524(e) by releasing any claims the debtor may have against Condor, that no substantial contribution claim under 11 U.S.C. § 503(b) is warranted, that the plan conveys to Condor property upon which it does not have a lien, and that the plan is not fair and equitable in light of these foregoing provisions and Condor's proposal that its employee serve as a disbursing agent were all mooted prior to the confirmation hearing as Condor stipulated that it will amend its plan to remove these particular provisions to which the Partners objected.

## IV. REQUISITES OF CONFIRMATION

■ Confirmation of a chapter 11 plan is generally governed by 11 U.S.C. § 1129, which provides two paths for obtaining confirmation. One avenue is to satisfy all the requirements under subsection (a) of this

---

**10.** Section 1123(a)(2) provides that "[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall ... specify any class of

claims or interests that is not impaired under the plan."

provision, including subsection (a)(8) which requires that all impaired classes of claims and interests accept the plan. The second way to obtain confirmation is to satisfy the requirements of section 1129(b), which includes all of the requirements of subsection (a) with the exception of subsection (a)(8) and imposes two additional requirements: that the plan not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired and has not accepted the plan. Because neither Condor nor the Partners obtained acceptances from all their impaired classes and interests, both are seeking approval of their third amended plans under subsection (b), commonly referred to as the "cramdown" alternative. The Partners and Condor each have the burden of persuading the court that their particular plan is capable of confirmation. *See, e.g., In re Beare Co.*, 177 B.R. 886, 889 (Bankr.W.D.Tenn.1994) (citing *In re Apple Tree Partners, L.P.*, 131 B.R. 380, 393 (Bankr.W.D.Tenn.1991)). The court will address the issues raised by the various objections to confirmation, starting with the objections to the Partners' plan.

## V. OBJECTIONS TO PARTNERS' PLAN

### A. Separate Classification of Condor's Deficiency Claim

■ Condor asserts that the Partners' separate classification of its unsecured deficiency claim from that of other unsecured claims is improper "gerrymandering" of classes in violation of § 1122(a) [11] and therefore the plan does not meet the requirement of § 1129(a)(1) that the plan comply with applicable provisions of title 11, the Bankruptcy Code. Condor acknowledges that the court previously ruled against it on this issue in the context of its stay relief motion, but requests that the court reconsider the issue against the factual backdrop of the Partners' third amended plan in order to fully appreciate the impropriety of such classification. Because Condor's unsecured deficiency claim of $1.075 million was placed in a separate class from unsecured trade debt totaling about $26,000.00, the Partners were able to obtain the acceptance of their plan by an impaired class, a result which would not have been possible if Condor's deficiency claim had been placed in the same class since it would have been able to control the voting due to the great disparity in the amount of its claim. Acceptance of the plan by at least one impaired class is a confirmation requirement under § 1129(a)(10). [12] Condor charges that the effect of the separate classification is to make a mockery of the entire voting process. As before, Condor asserts that seven of the circuits [13] have ruled that the unsecured deficiency claim of a secured creditor may not be placed in a class separate from that of general unsecured claims in a single

---

11. Regarding the classification of claims and interests, 11 U.S.C. § 1122 provides as follows:
 (a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.
 (b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

12. This particular requirement is as follows:
 If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by an insider.
 11 U.S.C. § 1129(a)(10).

13. Although the seven circuits cited by Condor are the Courts of Appeals for the Second, Third, Fourth, Fifth, Eighth, Ninth and Eleventh Cir-

cuits, the case cited from the Eleventh Circuit did not involve an unsecured deficiency claim. *See Olympia & York Florida Equity Corp. v. Bank of New York (In re Holywell Corp.)*, 913 F.2d 873 (11th Cir.1990). *See also Boston Post Rd. Ltd. Partnership v. FDIC (In re Boston Post Rd. Ltd. Partnership)*, 21 F.3d 477 (2d Cir.1994), *cert. denied* 513 U.S. 1109, 115 S.Ct. 897, 130 L.Ed.2d 782 (1995); *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154 (3rd Cir.1993), *reh'g denied* (1993); *Travelers Ins. Co. v. Bryson Properties, XVIII (In re Bryson Properties, XVIII)*, 961 F.2d 496 (4th Cir.1992), *cert. denied* 506 U.S. 866, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992); *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (Matter of Greystone III Joint Venture)*, 948 F.2d 134 (5th Cir.1991), *as amended on petition for reh'g and suggestion for reh'g en banc* 995 F.2d 1274 (1992), *cert. denied* 506 U.S. 821, 822, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992); *Lumber Exch. Bldg. Ltd. Partnership v. Mut. Life Ins. Co. of New York (Matter of Lumber Exch. Bldg. Ltd. Partnership)*, 968 F.2d 647 (8th

asset chapter 11 case and continues to maintain that the Sixth Circuit Court of Appeals would similarly rule if it were now confronted with the issue.

This court is unpersuaded that its earlier ruling was incorrect. In its *U.S. Truck* decision rendered in 1986, the Sixth Circuit Court of Appeals upheld the debtor's separate classification of the unsecured claim of the Teamsters Union arising from the rejection of a collective bargaining agreement even though the debtor admitted the purpose of the classification was to line up votes in favor of the plan. *In re U.S. Truck Co.*, 800 F.2d at 586, n. 8. Like the present case, if the Teamsters claim had been classified with the other unsecured claims, it is questionable whether the debtor would have been able to obtain the approval of its plan by an impaired class. After an extensive analysis of § 1122 and its legislative history, the Sixth Circuit concluded that § 1122 gives the courts broad discretion to determine proper classification according to the factual circumstances of each individual case. *Id.* at 586. Because the district court found the interests of the Teamsters to be substantially dissimilar from those of the other impaired creditors in three respects,[14] the Sixth Circuit found the separate classification to be proper and even suggested that separate classification was mandatory under the circumstances. "[T]o allow the [Teamsters] to vote with the other impaired creditors would be to allow it to prevent a court from considering confirmation of a plan that a significant group of creditors with similar interests have accepted." *Id.* at 587.

Even though *U.S. Truck* was not a single asset case, reported bankruptcy court decisions in the Sixth Circuit subsequent to *U.S. Truck* have uniformly held that the case supports the separate classification of a secured creditor's deficiency claim under § 1111(b) due to the substantially different attributes and interests of the secured creditor from those of the general unsecured creditors. *See In re Rivers End Apartments, Ltd.*, 167 B.R. at 478–79; *In re Creekside Landing, Ltd.*, 140 B.R. at 715; *In re Aztec Co.*, 107 B.R. at 587. There is nothing in *U.S. Truck* which leads this court to believe that the Sixth Circuit would now rule differently on this issue. Granted, *U.S. Truck* was decided by the Sixth Circuit before any of the seven circuit decisions on which Condor relies, but a division among the lower courts already existed at the time the Sixth Circuit rendered its decision. *See In re U.S. Truck Co.*, 800 F.2d at 585. Furthermore, the circuits are by no means uniform at this time in their stance on the separate classification issue in single asset cases. Although the construction urged by Condor is the majority view among the circuits, there is also a strong minority to the contrary. *See* 7 COLLIER ON BANKRUPTCY ¶ 1122.03[6][c] (15th ed. rev. 1997) and cases cited therein. In fact, the Seventh Circuit Court of Appeals has held that § 1122 not only permits, but *requires* separate classification from other general unsecured debts of an unsecured deficiency claim under § 1111(b) because such a claim is not substantially similar to general unsecured debt. *Matter of Woodbrook Assocs.*, 19 F.3d 312 (7th Cir.1994), *reh'g denied* (1994).

Condor's charge that permitting separate classification makes a mockery of the voting process simply has no validity. As the Sixth

---

Cir.1992); *In re Montclair Retail Ctr. L.P.*, 177 B.R. 663 (9th Cir. BAP 1995). Probably the leading case of these decisions is *Matter of Greystone III Joint Venture* wherein the Fifth Circuit stated that "the one clear rule that emerges from otherwise muddled caselaw on § 1122 claims classification" is that "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *Matter of Greystone III Joint Venture*, 995 F.2d at 1279.

**14.** The interests of the Teamsters Committee were substantially dissimilar from those of the creditors in Class XI because:

(1) the employees represented by the Teamsters Committee [had] a unique continued interest in the ongoing business of the debtor; (2) the mechanics of the Teamsters Committee's claim differ[ed] substantially from those of the Class XI claims; and (3) the Teamsters Committee's claim [was] likely to become part of the agenda of future collective bargaining sessions between the union and reorganized company.

*In re U.S. Truck Co.*, 800 F.2d at 584.

Circuit noted in *U.S. Truck,* separate classification does not automatically result in adoption of the plan. *See In re U.S. Truck Co.,* 800 F.2d at 587. A segregated claim holder is still protected by the unfair discrimination and fair and equitable requirements of 11 U.S.C. § 1129(b). *Id.* In light of the foregoing, Condor's objection to the Partners' plan based on improper classification of Condor's deficiency claim will be overruled.

### B. Class Three Gerrymandering

■ Condor asserts that the Partners' plan is defective because the Partners have gerrymandered the voting of *Class Three,* which consists of the unsecured trade debt, by including within this class the claim arising from the rejection of the debtor's management contract with American Apartment Management Company. The management company's claim of $18,041.55 dominates this class and thus controlled the voting since the remaining unsecured trade debt is less than $10,000.00. Condor notes that the first three plans filed by the Partners provided for assumption of the management contract, but that in their third amended plan "the Partners suddenly decided to reject the claim in order to add an $18,000 claim to Class [Three] and control voting." Condor concedes that even with an assumption of the contract the debtor would still have to cure the default and pay the entire claim, but nonetheless asserts that under these circumstances, the claim would be paid pursuant to an assumption rather than as a *Class Three* claim. Because the debtor intends to sign a new contract with the same management company after the rejection and the company is 50% owned by Walter Trent's father, Condor contends that the Partners' true motivation is shown by the classification and that if the management company claim were excluded from the voting, it would be questionable whether *Class Three* accepted the plan.

At the confirmation hearing, Walter Trent explained that the Partners proposed the rejection of the current management contract because it contained certain provisions mandated by HUD which would not normally be found in a standard management contract. One such provision was that the present contract could be terminated upon thirty-days notice. Mr. Trent testified that under the Partners' plan, the debtor and American Apartment Management Company will enter into a new agreement based on the conventional apartment housing industry standards which includes an annual term.

This court finds nothing improper in the Partners' decision to reject rather than assume the current management contract with American Apartment Management Company, notwithstanding the fact that the debtor will continue to use the same management company albeit under a new agreement. Apparently, regardless of whether the current contract is assumed or rejected, the management company's claim will be the same amount. True, the earlier versions of the Partners' plan did provide for assumption rather than rejection of the management contract, but those plans still specified that the claim arising from the assumption of the management contract would be a *Class Three* claim. Thus, even if the Partners had not changed their current plan in this regard, the American Apartment Management Company's claim would still have been included in *Class Three* and dominated the voting of this class. Accordingly, the court finds Condor's objection on this issue to be without merit.

### C. Artificial Impairment of Class Three

Condor contends that even if the votes in *Class Three* are sufficient for this class to accept the Partners' plan, the class should not be deemed impaired for purposes of § 1129(a)(10) because it was "artificially impaired."[15] Under the Partners' plan, the

---

15. 11 U.S.C. § 1124 specifies the manner in which a plan may leave a claim or interest unimpaired:

> Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—

(1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or

(2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive

equity security holders of the debtor will establish a "new equity fund" in the amount of $170,000.00 or such greater amount as the Partners determine will be needed to fund the plan. Out of this new equity fund, the debtor will pay on the effective date of the plan all administrative expenses less any retainers,[16] fifty percent of the *Class Three* claims and $100,000.00 on Condor's *Class Two* claim, *i.e.,* its allowed secured claim. The remaining fifty percent of the *Class Three* claims will paid six months after the effective date. Condor asserts that there will be more than sufficient monies in the new equity fund to pay the *Class Three* claims in full on the effective date of the plan, that the Partners have no legitimate business reason for delaying full payment, and that their sole reason for doing so is to "manipulate" an accepting impaired class, without which the Partners would not be able to cramdown their plan over Condor's objection. Condor requests that *Class Three* not be considered impaired because of this artificial impairment or, at a minimum, that this artificial impairment be accepted as evidence of the Partners' lack of good faith in proposing the plan.

At the confirmation hearing, Mr. Trent admitted on cross-examination that if another thirteen to fifteen thousand dollars had been raised from the equity security holders, all of the *Class Three* claims could have been paid in full upon confirmation rather than half at that time and the remaining half six months later. He opined, however, that the Partners had raised all of the money which they thought could be raised. Mr. Trent further acknowledged that if their plan proposed to pay Condor $85,000.00 at confirmation as opposed to $100,000.00, then the *Class Three* creditors could have been paid in full

on the effective date, but that it was his choice to establish the plan in this manner.

Though the courts are hotly divided on this issue, it appears the majority of courts do not permit satisfaction of § 1129(a)(10) through impairment of a class which was tactically motivated and not substantively necessary. *See* Paul Rubin, *Fleeting Hope For Single Asset Real Estate Debtors?,* 16 AM. BANKR. INST. J. 1 (March 1997). These decisions are based on the premise that a claim paid in full at confirmation is not impaired, which undisputably was the law prior to the enactment on October 22, 1994, of the Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, 108 Stat. 4106. Prior to that time, 11 U.S.C. § 1124(3) provided as follows:

> [A] class of claims or interest is impaired under a plan unless, with respect to each claim or interest of such class, the plan ... (3) provides that, on the effective date of the plan, the holder of such claim or interest receives, on account of such claim or interest, cash equal to—(A) with respect to a claim, the allowed amount of such claim....

However, Section 213(d) of the Bankruptcy Reform Act amended § 1124 by deleting subsection (3) in its entirety.

The courts which have considered the current version of § 1124, most notably Judge Kahn in his decision of *In re Atlanta–Stewart Partners,* have concluded that the deletion of subsection (3) from § 1124 means that there is no longer an exception to the general rule that all classes are deemed impaired for claims paid in full upon the effective date of the plan or, in other words, a class of creditors which will receive payment in full upon the effective date of the plan is now impaired within the meaning of the Bankruptcy Code. *See In re Atlanta–Stewart Partners,* 193

---

accelerated payment of such claim or interest after the occurrence of a default—

 (A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title;

 (B) reinstates the maturity of such claim or interest as such maturity existed before such default;

 (C) compensates the holder of such claim or interest for any damages incurred as a result of

any reasonable reliance by such holder on such contractual provision or such applicable law; and

 (D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

**16.** The only administrative expenses estimated by the plan are the professional fees of debtor's counsel which are expected to total $65,000.00 less a $10,000.00 retainer held by counsel.

B.R. 79, 82 (Bankr.N.D.Ga.1996); *PNC Bank v. Park Forest Dev. Corp. (In re Park Forest Dev. Corp.),* 197 B.R. 388 (Bankr.N.D.Ga. 1996); *In re Willow Creek Apartments, Ltd.,* 1996 WL 343450 at *2 (Bankr.M.D.N.C.1996)(dictum). *See also* Neil Batson, *Real Estate Problems in the Bankruptcy Court—Selected Issues in Single Asset Real Estate Cases,* 753 PLI/COMM 401, 408 (April 1997) (Perhaps an unintended result of the 1994 amendments is that "a debtor's plan may provide for the payment in full of a class of unsecured claims and satisfy the requirements of subsection 1129(a)(10) of the Code because the elimination of subsection 1124(3) means that these claims are 'impaired.' "); David Gray Carlson, *Artificial Impairment and the Single Asset Chapter 11 Case,* 23 CAP. U.L. REV. 339, 375 (1994) ("[A]fter the 1994 amendments, the ability to disimpair creditors by paying them in full may no longer exist [and] the technology of artificial impairment may have been permanently ruined."); *but see* Paul Rubin, *Fleeting Hope For Single Asset Real Estate Debtors?,* 16 AM. BANKR. INST. J. 1 (March 1997) (critical of *Atlanta–Stewart Partners* and its progeny).

■ Although initially skeptical, this court finds Judge Kahn's reasoning and thus his holding in *Atlanta–Stewart Partners* to be persuasive. As stated by that court:

> In deleting § 1124(3), Congress was responding to the result reached in the case of *In re New Valley,* 168 B.R. 73 (Bankr. D.N.J.1994). In *New Valley,* the court determined that, where a solvent debtor's plan proposed to pay a class of creditors in full, but without postpetition interest, the class was unimpaired pursuant to § 1124(3). While deleting § 1124(3) in its entirety seems an extreme remedy for the problem arising in *New Valley* (for example, Congress could have amended § 1124(3) to distinguish between solvent and insolvent debtors), the legislative history demonstrates that Congress intended to do away with the concept that a creditor receiving payment in full is unimpaired.
>
> As a result of this change, if a plan proposed to pay a class of claims in cash in the full allowed amount of the claims, the class would be impaired entitling creditors to vote for or against the plan of reorganization. If creditors vote for the plan of reorganization, it can be confirmed over the vote of a dissenting class of creditors only if it complies with the "fair and equitable" test under section 1129(b)(2) of the Bankruptcy Code and it can be confirmed over the vote of dissenting individual creditors only if it complies with the "best interests of creditors" test under section 1129(a)(7) of the Bankruptcy Code.

140 CONG.REC. H10752 (Oct. 4, 1994).

*In re Atlanta–Stewart Partners,* 193 B.R. at 81–82. The court went on to reject the dissenting creditor's argument that a class receiving payment in full from an insolvent debtor should still be considered an unimpaired class under § 1124(1), which provides that a class of claims is unimpaired if the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." The court observed that a common sense approach to subsection (1) would not include payment in full within the meaning of this provision because a creditor who receives payment of its claim in its entirety does not retain any legal, equitable, or contractual rights and that such a reading of § 1124(1) would have rendered the former subsection (3) superfluous. *Id.* at 81. Although the court admitted that its holding "seems contrary to the way we have traditionally thought of impairment under the Code," it observed that the advantage of the change is that confirmation fights will now focus on the "fair and equitable" and "best interest of creditors" tests rather than artificial impairment allegations. *Id.* at 82.

In light of the deletion of subsection (3) to § 1124 by the Bankruptcy Reform Act of 1994, the court concludes that it is no longer a valid argument to assert that the plan proponent can render a claim unimpaired by paying the claim in full at confirmation. Accordingly, Condor's objection based on artificial impairment will be overruled.

### D. Unfair Discrimination

The next objection raised by Condor is that the Partners' plan unfairly discriminates

against its unsecured deficiency claim. Unsecured trade debt in *Class Three* will be paid in full within 180 days of confirmation, while Condor's deficiency claim in *Class Five* will be paid over the ten-year life of the plan out of excess cash flow, with any balance owing at the end of the ten years to be paid from a sale or refinancing of the apartment complex. Condor estimates that the present value of the proposed payment stream, if made in the manner projected by the Partners, is about fifty percent of Condor's allowed unsecured claim since Condor will not be paid interest to offset the delay in payment.

Under section 1129(b)(1) of the Code, a plan may be confirmed against a nonaccepting impaired class only "if the plan does not discriminate unfairly" with respect to that class.[17] Thus, discrimination in the treatment of classes is permissible so long as it is not "unfair." *See In re 203 N. LaSalle St. Ltd. Partnership*, 190 B.R. 567, 585 (Bankr.N.D.Ill.1995), *stay denied, Matter of 203 N. LaSalle St. Partnership*, 190 B.R. 595 (N.D.Ill.1995), *aff'd, Bank of America, Illinois v. 203 N. LaSalle St. Partnership*, 195 B.R. 692 (N.D.Ill.1996); *In re Aztec Co.*, 107 B.R. at 588–89. Unfortunately, the Bankruptcy Code does not specify any standard for determining the fairness of discrimination. Various tests have been developed by the courts to fill this void. *See* 7 COLLIER ON BANKRUPTCY ¶ 1129.04[3][a] (15th ed. rev. 1997).

In his *Aztec* decision, Judge Lundin formulated a four-part inquiry borrowed from a similar unfair discrimination rule applicable to chapter 13 plans, 11 U.S.C. § 1322(b)(1). Those four factors to consider are: "(1) whether the discrimination is supported by a reasonable basis; (2) whether the debtor can confirm and consummate a plan without the discrimination; (3) whether the discrimination is proposed in good faith; and (4) the treatment of the classes discriminated against." *In re Aztec Co.*, 107 B.R. at 589. Numerous courts have adopted this test in its entirety,[18] others have found only factors (1) and (2) to be relevant,[19] a few have reduced the test to one inquiry, essentially variations of factor (1),[20] and some have made the determination based on the facts of the individual case without specifying any particular standard. Regardless of the particular test to which one ascribes, one thing is clear: at a minimum there must be a rational or legitimate basis for the discrimination and the discrimination must be necessary for the reorganization. *See* 7 COLLIER ON BANKRUPTCY ¶ 1129.04[3][a] (15th ed. rev. 1997). Without either, it is impossible for disparate treatment to be considered fair.

The Partners' purported basis for the differentiation between payment of Condor's unsecured claim and the other unsecured trade debts is that it would be administratively inconvenient to pay the trade creditors over time in the same fashion as Condor's unsecured debt and the debtor will have insufficient funds to pay interest to Condor on its deficiency to compensate it for the delay in payment. Condor objects to the disparity from a present value analysis and

---

**17.** 11 U.S.C. § 1129(b)(1) provides in its entirety that:

Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

**18.** *See In re Bryson Properties, XVIII*, 961 F.2d at 502; *In re Jim Beck, Inc.*, 207 B.R. 1010 (Bankr. W.D.Va.1997); *In re Kliegl Bros. Universal Elec. Stage Lighting Co.*, 149 B.R. 306, 308 (Bankr. E.D.N.Y.1992); *In re 11,111, Inc.*, 117 B.R. 471,

478 (Bankr.D.Minn.1990); *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr.S.D.N.Y. 1990); *In re Rochem, Ltd.*, 58 B.R. 641, 643 (Bankr.D.N.J.1985).

**19.** *In re 203 N. LaSalle St. Ltd. Partnership*, 190 B.R. at 586 (discrimination must be supported by a legally accepted rationale and the extent of discrimination must be necessary in light of the rationale).

**20.** *See In re Barney and Carey Co.*, 170 B.R. 17, 25 (Bankr.D.Mass.1994) (rational basis); *In re Rivers End Apartments, Ltd.*, 167 B.R. at 488 (legal and practical differences provided a "rational basis" for later payment of deficiency claim).

questions whether it will in fact receive any payment on its unsecured debt, noting that there are no limitations or restrictions on the expenses or new debt which may be incurred by the debtor. Condor also asserts that payment of its deficiency is at risk and highly unlikely because the Partners' plan is not feasible.

Because of the relative size of the trade debt (approximately $26,000.00) as compared with the deficiency obligation (approximately $1.075 million), the court does not find the difference in time of payment, *i.e.*, that the trade creditors will be paid within six months while Condor will be paid over ten years, to be unfair, provided the Partners' plan is feasible. *See* 7 COLLIER ON BANKRUPTCY ¶ 1129.04[3][b][i] (15th ed. rev.1997) (if a large tort claim dwarfs all other unsecured claims, including those of trade creditors, it makes sense to separately classify the two and pay the trade or other creditors first or faster) and cases cited therein at n. 22. The debtor does not have sufficient monies to pay Condor within 180 days and a ten-year repayment is not unreasonable for a million dollar debt. Furthermore, trade creditors generally anticipate payment on a short-term basis, while a lender with a deficiency claim usually holds long-term note and has no expectation of quick payment. *See In re Rivers End Apartments, Ltd.*, 167 B.R. at 488.

This court, however, does not find the disparity in amount which the respective classes will actually recover under the plan to be fair. *See In re Cranberry Hill Assocs. Ltd. Partnership*, 150 B.R. 289, 290–91 (Bankr. D.Mass.1993) (plan unfairly discriminated where class of unsecured creditors paid in full at confirmation while deficiency claim paid in the present value range of 50% since bulk of claim would not be paid for nine years; former payment risk free, latter far from certain). The Partners have not articulated a rational basis for the discrimination against Condor's deficiency claim and in fa-

vor of the general unsecured creditors. Nor have the Partners demonstrated that the disparity in payment between the two unsecured classes is essential for the debtor's reorganization.[21] While it may be true that the debtor will have insufficient funds to pay interest on Condor's deficiency claim, no explanation has been offered as to why the trade creditors cannot simply be paid the same amount as Condor, *i.e.*, fifty percent of their claims, such that while the two classes will be paid at different times, the net amount realized will be the same (absent the risk inherent in any payment delay). *Cf., In re Graphic Communications, Inc.*, 200 B.R. 143, 149 (Bankr.E.D.Mich.1996) (debtor offered no substantiation for the alleged necessity of paying 100% to general unsecured creditors while paying one particular creditor only 10% of claim); *In re Sherwood Square Assocs.*, 107 B.R. 872, 879–80 (Bankr.D.Md. 1989)(no unfair discrimination where unsecured creditors paid 66.6% of their claims at confirmation and deficiency claimant paid 66.6% over 15 years where discount factor compensated for delay and risk). The discrimination between payment of the two classes herein is particularly acute in light of the fact that no evidence was offered by the Partners that paying the trade debts in full is necessary in order to effect a reorganization and because Condor will not be receiving any specified monthly or annual payment but is being paid strictly out of excess cash flow which is defined as funds remaining after payment of all expenses and debt service to any lender. Since there are no safeguards controlling the expenses or debts which may be incurred by the debtor, the bulk of Condor's deficiency claim could go unpaid over the majority of the life of the plan, resulting in even less of a dividend to Condor and an increasing risk of nonpayment. Accordingly, Condor's objection to confirmation of the Partners' plan based on unfair discrimination will be sustained.

**21.** Even if the court were to find that the proposed discrimination is necessary for the debtor's reorganization because the debtor will have insufficient funds to pay Condor interest to compensate for the delay in payment, no basis or rationale has been suggested to support the discrimination. Inability to reorganize without the discrimination in and of itself is not a legitimate basis for disparate treatment or the standard would in effect be written out of the Code. Any discriminatory treatment could be justified based on the argument that the plan will not succeed otherwise.

### E. Feasibility

The feasibility requirement for confirmation is found in 11 U.S.C. § 1129(a)(11), which requires a finding that confirmation· "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor." The purpose of this section of the Code is to "prevent confirmation of visionary schemes which promise creditors more under a proposed plan than that which the debtor can possibly attain after confirmation." *Berkeley Fed. Bank & Trust v. Sea Garden Motel and Apartments (In re Sea Garden Motel and Apartments)*, 195 B.R. 294, 304 (D.N.J.1996) (quoting *In re Trail's End Lodge, Inc.*, 54 B.R. 898, 903–04 (Bankr.D.Vt.1985)). To establish feasibility, a proponent must demonstrate that its plan has a reasonable prospect of success and is workable. *See In re Grandfather Mountain Ltd. Partnership*, 207 B.R. 475, 485 (Bankr.M.D.N.C.1996); *In re Rivers End Apartments, Ltd.*, 167 B.R. at 476. The test of whether a debtor "can accomplish what the plan proposes is a practical one and, although more is required than mere hopes and desires, success need not be certain or guaranteed." *In re Grandfather Mountain Ltd. Partnership*, 207 B.R. at 485. "A critical issue in assessing the feasibility of a plan which provides for the debtor's continued operation is whether the debtor can generate 'sufficient cash flow to fund and maintain both its operations and obligations under the plan.'" *In re Trevarrow Lanes, Inc.*, 183 B.R. 475, 482 (Bankr.E.D.Mich.1995) (quoting *In re SM 104 Ltd.*, 160 B.R. 202, 234 (Bankr.S.D.Fla.1993)). "Specifically, a plan proponent must show that its projections of future earnings and expenses are derived from realistic and reasonable assumptions and that it has the ability to make the proposed payments." *In re Rivers End Apartments, Ltd.*, 167 B.R. at 476.

To establish feasibility, the Partners offered the debtor's income statements for 1995 and 1996, cash flow projections for the life of the plan prepared by Walter Trent, the managing general partner, and Mr. Trent's testimony. Mr. Trent testified that the projections were based on the history of the property, the court's valuation ruling, and the appraisals of the property prepared in connection with the valuation hearing. The projections for 1997 indicate effective gross income ("EGI") of $1,647,-957.00 based on an 8% vacancy rate, less operating expenses at 46.47% of EGI and replacement reserves of $250.00 per unit or $70,000.00, for net operating income of $810,957.00 ("NOI"). After the annual payment on Condor's secured claim ($787,-636.00) is deducted from NOI, a balance of $23,321.00 is projected to remain, of which Condor is paid 90% thereof in payment on its unsecured claim, leaving net cash to the debtor in 1997 of $2,332.00. Projections after 1997 are based on the assumption that rental income and expenses will increase at an annual rate of 2%, with other income remaining constant.

Condor contends that the Partners' own projections establish that their plan is unfeasible because neither the 1997 nor the 1998 projections take into account the required payment of the balance of the unsecured trade debt in the approximate amount of $13,000.00 due 180 days after confirmation and there is insufficient cash flow to pay that amount since the debtor will have less than $2,500.00 and $5,000.00 remaining in 1997 and 1998, respectively, after payment of operating expenses and debt service. Condor observes that the Partners' plan is based on an 8% vacancy rate, but that vacancy is currently 10% and has been since the beginning of the year and that over the course of the last five years, the vacancy rate has ranged from a high of 15% to a low of 4%. Condor also asserts that the operating expenses percentage of 46.47% used in the projections is low because the testimony at the valuation hearing was that debtor's actual expenses in 1996 were 47.5% of EGI. Finally, Condor points out that Mr. Trent admitted in his testimony that there will be insufficient funds to meet plan obligations if there are minor percentage inaccuracies in the rental income, vacancy rate or the operating expense projections.

Condor is correct in its observation that the Partners' projections do not account for payment of the unsecured trade debt balance due in six months. When this flaw was

pointed out to Mr. Trent on cross-examination, he testified that he would personally pay this balance if cash flow were insufficient, although he admitted the plan did not obligate him to cover any cash flow deficiencies. On redirect, Mr. Trent suggested that another way to address the problem would be to pay the unsecured trade debt balance after the mortgage payment to Condor such that another $13,000.00 of Condor's unsecured debt would be bumped to the end of the ten-year plan and paid from the sale or refinancing of the apartment complex.

Clearly, if the Partners' projections were "right on the money," a feasibility problem would arise immediately in the plan because the projections do not demonstrate that the debtor will have sufficient cash flow to make the required payment to unsecured trade creditors in six months along with the 1997 anticipated distribution on Condor's unsecured claim. The Partners' projections, however, are on the conservative side as an examination of the debtor's current cash flow statements and those over the last few years demonstrate that the debtor should realistically be able to timely satisfy, as anticipated, both the obligations to the general unsecured creditors and Condor on its unsecured debt, even with the current 10% vacancy rate. According to the debtor's July 1997 monthly operating report, the debtor's total revenue or EGI for the first six months of 1997 was $923,973.75 or $1,847,946.50 annualized, almost $200,000.00 more than the projected 1997 EGI. Expenses for the first half of 1997 were 47% of EGI, leaving an annualized NOI of $908,641.30 after the deduction for replacement reserves, or almost $100,000.00 greater than projected, which would enable the debtor to pay both the unsecured trade debt balance and the projected distribution on Condor's unsecured debt. What is significant about the 1997 actual figures as shown on the monthly operating reports is that they surpass the Partners' projected 1997 NOI even though the vacancy rate for 1997 thus far has been 10% rather than the anticipated 8%[22] and expenses have been 47% rather than the projected 46.47%. Furthermore, these actual 1997 numbers do not appear to be aberrations, but instead are consistent with a trend of increasing revenues which began in 1995. Both the 1995 and 1996 income statements for the debtor indicate NOIs greater than the 1997 projected $810,957.00; the debtor's NOI in 1996 was $849,098.90 and $843,941.00 in 1995.[23] Operating expenses for these years and the two preceding years was 46% of EGI in 1993, 43.7% in 1994, 44% in 1995 and 44.7% of EGI in 1996,[24] all lower than the conservative 46.47% utilized by the Partners in their projections.[25]

The fact that the Partners' plan provides for a balloon payment of the balance of both Condor's secured and unsecured debt at the end of the ten-year plan does not in and of itself render the plan unfeasible. *See In re Landing Assocs., Ltd.*, 157 B.R. 791, 820 (Bankr.W.D.Tex.1993)(citing *In re Club Assocs.*, 107 B.R. 385 (Bankr.N.D.Ga.1989), *appeal decided* 956 F.2d 1065 (11th

**22.** The 8% vacancy rate utilized by the Partners in their plan is consistent with the property's history and the rate utilized by two of the three appraisers (the third used 10%). According to the appraisal by Richard Wallace, vacancy levels at the property fluctuated in the previous five years from 3% to 15% with an average of 7% and the comparable apartment complexes utilized in his appraisals to compute value typically had a vacancy rate in the 5% range.

**23.** The 1996 figure was calculated from the debtor's 1996 income statement. The 1995 number was taken from this court's valuation memorandum opinion of January 17, 1997.

**24.** The court is puzzled by the affirmative response given by Mr. Trent when he was asked on cross-examination by Condor's counsel whether the appraisers at the valuation hearing had consistently testified that the debtor's actual expenses in 1996 was 47.5%. The court does not recall any such testimony, nor any testimony as to the income expense ratio in 1996. At the time the valuation hearing was held on December 20, 1996, only the first eleven months of financial information was available and this data annualized indicated a 44% ratio.

**25.** The projected 46.47% is also higher than the percentages used by the appraisers in their calculation of value based on the income approach: Michael Green utilized a 42.1% ratio, David Harris estimated 42.29%, which he stated was based on the complex's financial statements and data from other typical properties, and Richard Wallace estimated expenses at 46% of EGI which he testified was the property's historical ratio.

Cir.1992)(nothing inherently infeasible about providing balloon payment in plan)). Establishing feasibility of a plan with a balloon payment scheme depends on the debtor demonstrating that the funds will be available at the time the payment is due. *See First Nat'l Bank of Boston v. Fantasia (In re Fantasia)*, 211 B.R. 420, 422–23 (1st Cir. BAP 1997). Those courts that have found proposed plans calling for balloon payments unfeasible have almost always done so because the balloon payment was scheduled to come due in a relatively short time. *See In re SM 104 Ltd.*, 160 B.R. at 239 n. 69.

In the present case, the evidence establishes that Condor's secured debt will have been reduced by $1.3 million at the end of the ten years, leaving a balance owing of $6,855,000.00, and if payment is made on Condor's unsecured debt in accordance with the Partners' projections the sum of $176,-217.00 will remain requiring a total balloon payment to Condor of $7,031,217.00. Andrew Higgins opined that the apartment complex will be worth $11 million at the end of the ten years, which would enable the debtor to refinance the Condor debt at a 64% loan to value ratio. These numbers indicate that the debtor should have little difficulty in obtaining the funds to make the necessary balloon payment. Accordingly, feasibility has been established.

### F. Appropriate Discount Factor for Condor's Secured Claim

In order for a chapter 11 plan to be confirmed over the objection of a dissenting secured creditor, the plan must meet the "fair and equitable" test set forth in 11 U.S.C. § 1129(b)(2)(A).[26] With respect to a class of secured claims, a debtor must show that the secured creditor will retain its lien and will be paid the allowed amount of its secured claim as of the effective date of the plan. *In re Beare Co.*, 177 B.R. at 885. Because the creditor is not receiving that amount in a lump sum but rather in deferred payments over the life of the plan, the stream of future payments under the plan must be discounted to present value and the present value of the stream of future payments must be not less than the allowed amount of the creditor's claim. *See In re Ridgewood Apartments of DeKalb County, Ltd.*, 183 B.R. 784, 791 (Bankr.S.D.Ohio 1995).

As stated by the Sixth Circuit Court of Appeals with respect to similar language in the chapters 12 and 13 cramdown process:

> [A]s this amount will not be paid immediately, interest should be assessed on the amount which the debtor will repay to compensate the creditor for the use of his or her money. "Section 1325(a)(5)(B) seems to require the Bankruptcy Court to assess interest on the secured claim for the present value of the collateral (if it is not to be paid immediately) in order not to dilute the value of that claim through delay in payment."

*U.S. v. Arnold*, 878 F.2d 925, 928 (6th Cir. 1989), *reh'g and reh'g en banc denied* (1989) (quoting *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427, 429 (6th Cir.1982)). The Sixth Circuit has determined in the context of chapters 12 and 13 that the appropriate discount or interest rate which must be paid to ensure that the value of a secured claim will not be diluted is "the current market rate of interest used for similar loans in

---

**26.** That subsection provides as follows:
For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
(A) With respect to a class of secured claims, the plan provides—
(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or
(iii) for the realization by such holders of the indubitable equivalent of such claims.
11 U.S.C. § 1129(b)(2)(A).

the region." *Memphis Bank,* 692 F.2d at 431; *see also In re Arnold,* 878 F.2d at 930. Because of the similarities between the cram-down provisions of chapters 12 and 13 with § 1129(b)(2)(A)(i), the bankruptcy courts in this circuit have uniformly applied this same standard to determine the appropriate discount rate in chapter 11 proceedings. *See, e.g., In re Ridgewood Apartments of DeKalb County, Ltd.,* 183 B.R. at 791–92; *In re Aztec Co.,* 99 B.R. 388, 390 (Bankr.M.D.Tenn.1989).

In the instant case, the Partners' plan divides Condor's secured claim into two components in order to provide Condor with the required current market rate of interest. Seventy-five percent of the principal amount of the secured claim will bear interest based on a thirty-year amortization at 160 basis points over the 14–year treasury bill rate as of the confirmation hearing (6.83%), *i.e.,* 8.43%, while the remaining 25% will bear interest at 260 points over the fourteen-year treasury bill rate, *i.e.,* 9.43%, based on a twenty-year amortization. Condor contends that this proposal is inadequate and does not provide a "current market rate of interest."

In support of its objection, Condor offered the testimonies of two experts in the real estate or commercial financing fields. The first expert was Bertram Lyles, a mortgage broker with eighteen years of experience in real estate finance matters, including the financing of multi-family properties. Mr. Lyles testified that he knew of no lender who would finance a loan with virtually a 100% loan to value ratio as would be required in the present case although a credit company-type participating loan would come the closest. Having polled several credit company lenders who are actively making participating loans, Mr. Lyles testified that typically the lenders would price the first 70% or 75% of the loan to value at a 160 point spread over the ten-year T-bill rate since that was the term of the plan, with the remaining 25% to 30% of the loan at an interest rate in the 18% to 25% range. In his opinion, the lowest rate obtainable for a loan with a 95% loan to value ratio or higher would be in 11% to 12% range. Mr. Lyles was critical of the Partners' proposed 1% interest rate differential between the 75% first tier and the 25% second tier, stating that a 1% premium would be insufficient to generate any serious lender interest for the second tier because there was too much risk and too little reward. He noted that the higher the loan to value ratio, the greater the interest rate required because lenders demand a higher return in compensation for greater risk.

On cross-examination, Mr. Lyles acknowledged that the debtor's anticipated net operating income of $820,000.00 would not fund the debt service required for an 11% or 12% interest rate, but observed that the lender would be paid by requiring a shorter amortization period for the junior piece and additional interest payments through a large percentage of excess cash flow, with any remaining deferred interest paid at a sale or refinancing on a specified balloon date. Mr. Lyles noted that a lender typically does not adjust pricing based on what the property can afford except within a very limited range and commented that a lender's primary consideration in making a loan is whether it will earn a return commensurate with the degree of risk and capital committed.

Condor's second expert was Andrew Higgins, an investment banker and financial counselor representing both borrowers and lenders. In his written report, Mr. Higgins concluded that the current market rate for apartment financing with an 80% loan to value ratio was generally between 200 and 300 basis points above the comparable maturity treasury bill rate and that an appropriate rate in the 95% loan to value range and above was 11%. At the confirmation hearing, Mr. Higgins testified that it was difficult to ascertain the current market rate of interest for an apartment complex loan with a 95% to 100% loan to value ratio since very few lenders would make a loan with anything above a 90% ratio. In his experience, higher ratio restructured loans have a base interest rate as well as an annual escalating rate. A number of such loans provide for participation in excess cash flow and a percentage of sale proceeds above the debt payoff upon a sale or refinancing of the property, with the requisite percentage sometimes as high as 25%, although that rate will often decline during the life of the investment. Blending these considerations to produce a market

rate, Mr. Higgins concluded that the overall yield to the mortgage holder would be in the range of 11% to 12%. Mr. Higgins opined, however, that even with this rate, no lender would finance the loan in question because of the high loan to value ratio and the inadequacy of the debtor's net operating income to meet the debt service necessitated by a loan at 11% interest.

The Partners offered through deposition the testimony of Barry Cullen, a mortgage banker with over 25 years experience and a recognized expert in the field of commercial real estate lending and pricing. Mr. Cullen testified that it was very difficult to determine the appropriate market rate for 100% financing of an apartment complex because there is no such thing as 100% financing. To do so, however, he devised what he characterized as a "true market financing proposal" with a first tier composed of 75% of the value of the complex and a gap loan for the remainder. From his derived knowledge of the apartment complex, Mr. Cullen concluded that a lender would place the property on a ten to thirty schedule, which means a ten-year term with a thirty-year amortization, and index the loan over the ten or fourteen year treasury bill rate.[27] By placing a 160 basis point spread on the fourteen-year treasury bill rate which was 6.77% at the time of his deposition, Mr. Cullen arrived at a market rate of 8.37% for the first tier and added an additional 100 basis points for the second tier for a rate thereon of 9.37%. He then reduced the amortization on the second tier from thirty to twenty years since in his estimation a prudent lender would be concerned more with accelerating the return of its investment than achieving a return *on* its investment. Blending the two tiers produced an overall simple interest rate of 8.62% and a principal and interest constant rate of 9.6%. Mr. Cullen recognized that no market would actually engage in the type financing suggested for the second tier because of the loan to value ratio although he believed the numbers and rates chosen by him were market driven. Mr. Cullen strongly disagreed with Andrew Higgins' conclusion that a 200 or 300 point spread is the market rate with respect to the first tier.

On cross-examination, Mr. Cullen acknowledged that a loan to the debtor would be thrown into immediate default if the interest rate were higher than he had opined but denied that he backed into his market rate conclusion by ascertaining what the debtor could afford. He pointed out, however, that a property's available cash flow was always considered in determining an appropriate loan interest rate and that property was never intentionally encumbered with debt it could not handle. Mr. Cullen acknowledged that it had been several years since he had actually brokered for lenders engaged in gap financing and that when he had done so the second tier rate was significantly higher than a 1% spread.

When questioned regarding Bert Lyles' conclusions, Mr. Cullen observed that Mr. Lyles' proposal did not specify whether the amortization was shortened on the second tier. Furthermore, the second tier proposed by Mr. Lyles was that of an equity participation loan structure which has a higher spread to offset the risk of nonpayment since the debt is repaid only if there is available cash flow. A true debt financing such as he had proposed on the other hand has less risk and provides the lender a higher yield on the front side of the loan and a more accelerated return of capital through regular installments. In Mr. Cullen's opinion, the 10%–15% range suggested by Condor would produce a reasonable yield on the second tier if the second tier were an equity position for which there is greater risk since in such cases there is no guaranteed repayment.

 Although the question is a close one, the court concludes from the testimony presented that the discount rate proposed by the Partners is a reasonable rate of interest in the market place for a commercial loan secured by a multi-family property and thus a sufficient rate to provide Condor with the

---

27. Mr. Cullen testified that whether a ten or fourteen-year treasury bill is used will vary from lender to lender with a fourteen-year being the most conservative. Generally, a ten-year treasury bill is about 10 basis points lower than the fourteen-year T-bill rate. At the time of Mr. Cullen's deposition, the ten-year rate was 6.69%.

present value of its allowed secured claim as required by 11 U.S.C. § 1129(b)(2)(A)(i)(II). The blended rate of 8.68% which Condor will be paid is 199 basis points or almost 2% greater than the current ten-year T-bill rate of 6.69% which is the appropriate maturity since the plan provides for a ten-year repayment. *See In re Ridgewood Apartments of DeKalb County, Ltd.*, 183 B.R. at 792; *In re Overland Park Merchandise Mart Partnership, L.P.*, 167 B.R. 647, 659 (Bankr.D.Kan. 1994); *In re Eastland Partners Ltd. Partnership*, 149 B.R. 105, 107 (Bankr.E.D.Mich. 1992); *In re Oaks Partners, Ltd.*, 135 B.R. 440, 446 (Bankr.N.D.Ga.1991). A 2% spread over what is essentially a risk-free rate of the T-bill will adequately compensate for the risk of nonpayment and expected decrease in the dollar over time.[28] *See In re Ridgewood Apartments of DeKalb County, Ltd.*, 183 B.R. at 792.

The interest rates urged by Condor include not only a return of capital but an additional premium to reward for the high risk associated with the second tier's 100% gap financing. As such, the suggested rates go beyond protecting the value of Condor's claim from dilution caused by the delay in payment which is the purpose of the discount factor. *See In re Rivers End Apartments, Ltd.*, 167 B.R. at 484.

**28.** Although the selection of the appropriate discount rate is a fact sensitive, case by case, inquiry, *see In re Duval Manor Assocs.*, 191 B.R. 622, 631 (Bankr.E.D.Pa.1996); the court notes that the discount rate proposed by the Partners is not out of line with rates upheld in other 100% loan to value cases. *See In re Overland Park Merchandise Mart Partnership, L.P.*, 167 B.R. at 660 (treasury bill rate plus 250 basis points); *In re Rivers End Apartments, Ltd.*, 167 B.R. at 485 (treasury note plus 250 basis points); *In re Bloomingdale Partners*, 155 B.R. 961, 986 (Bankr.N.D.Ill.1993) (treasury bond rate plus 325–350 basis points); *In re River Village Assocs.*, 161 B.R. 127, 139 (Bankr.E.D.Pa.1993), *aff'd* 181 B.R. 795 (E.D.Pa. 1995) (treasury bill rate plus 3%); *In re IPC Atlanta Ltd. Partnership*, 142 B.R. 547, 558 (Bankr.N.D.Ga.1992) (treasury bond rate plus 3%); *In re Oaks Partners, Ltd.*, 135 B.R. at 447(treasury bill rate plus 3%); and *In re Aztec Co.*, 99 B.R. at 392 (treasury bill plus 2%).

**29.** The evidence presented in this case follows a common pattern for chapter 11 confirmation hearings where the interest rate necessary for a cramdown is in dispute. As stated by the court in *Oaks Partners:*

As a general rule, a debtor's ability to pay is irrelevant in determining whether the plan provides for payment of the present value of a secured creditor's claim. *See United States v. Southern States Motor Inns, Inc. (Matter of Southern States Motor Inns, Inc.)*, 709 F.2d 647, 653 n. 9 (11th Cir.1983), *cert. denied* 465 U.S. 1022, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984). Although the applicable standard in determining present value is the current market rate for a new loan at the time of confirmation, it must be recognized that no actual loan is being made, only a restructuring of what is by reason of the Code's definition of allowed secured claim, a loan with a 100% loan to value ratio. *See In re Ridgewood Apartments of DeKalb County, Ltd.*, 183 B.R. at 792; *In re Overland Park Merchandise Mart Partnership, L.P.*, 167 B.R. at 659. If a secured creditor can demand a premium as an investment reward for the risk undertaken in connection with this hypothetical 100% loan to achieve the market rate when admittedly there is no such market, the resulting discount rate would be so prohibitedly high that most bankruptcy debtors who are by definition financially distressed would be unable to reorganize.[29] *See In re Ridgewood Apartments of DeKalb County, Ltd.*, 183 B.R. at

> The creditor introduces experts who ... testify that there is no market for this loan and that conventional lenders would not make a loan where the debt is equal to the value of the property. After they acknowledge the absence of a market as such, they go on to give their opinions that a lender would only make the loan if the interest rate were such and such. It is no coincidence that the rates to which they opine render the debtor's plan unfeasible.

*In re Oaks Partners, Ltd.*, 135 B.R. at 444–45. *See also In re Duval Manor Assocs.*, 191 B.R. at 630 (expert makes "unsurprising observation" that because of debtor's poor financial condition it is doubtful that lender would make loan against the property); *In re 203 N. LaSalle St. Ltd. Partnership*, 190 B.R. at 580 ("[A] market-based, nonrecourse loan for the entire value of real property is the economic equivalent of a flying pig: it does not and cannot exist. To compensate the lender properly for the increased risk it bears, the interest rate on such a loan would have to be higher than the discount rate used by the owner in valuing the property, and this would require a return to the lender of more than the anticipated cash flow of the property.").

792; *In re Rivers End Apartments, Ltd.*, 167 B.R. at 484. Surely this was not Congress' intent when it enacted the present value language of section 1129(b)(2)(A)(i)(II) and other corresponding cramdown provisions. *See In re Duval Manor Assocs.*, 191 B.R. at 630 (secured creditor's analysis of current market rate based on risk imposed by financial condition of debtor, debt service ratio, and loan to value ratio effectively wrote cramdown under 11 U.S.C. § 1129(b)(2) out of the Code for single asset real estate cases); *In re Rivers End Apartments, Ltd.*, 167 B.R. at 484 ("No sound legal or policy argument can be advanced . . . for increasing the discount factor because the debtor is a debtor or because the loan-to-value ratio is established by the Bankruptcy Code."); *In re Wolf*, 61 B.R. 1010 (Bankr.N.D.Iowa 1986) (consideration of a 100% loan to value ratio is inappropriate in the context of dealing with an existing loan); *In re Overland Park Merchandise Mart Partnership, L.P.*, 167 B.R. at 658 (market rate in cramdown does not include a return of more than 100% of secured claim notwithstanding 100% leveraged debt); *but see In re Snider Farms, Inc.*, 83 B.R. 977, 998 (Bankr.N.D.Ind.1988) (discount factor must reflect risks inherent in a 100% loan to value ratio). Consequently, Condor's objection to confirmation based on an allegedly inappropriate discount rate will be overruled.

### G. Fair and Equitable

■ In addition to the requirement that a plan may not discriminate unfairly against a dissenting impaired class, 11 U.S.C. § 1129(b)(1) also specifies that a plan must provide for "fair and equitable" treatment of the dissenting class in order to cramdown the plan over the objection. To meet this requirement with respect to a class of unsecured claims a plan proponent has two options as follows:

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

11 U.S.C. § 1129(b)(2)(B).

■ Under subsection (i), future payments to the holder of an unsecured claim must equal the present value of that claim as of the effective date of the plan. Notwithstanding the fact that the Partners' plan provides for payment in full of Condor's unsecured claim over the life of the plan, subsection (i) has not been met because Condor is not receiving the present value of its claim as it is not being paid interest to account for the delay and risk in payment. *See Liberty Nat'l Enterprises v. Ambanc La Mesa Ltd. Partnership (In re Ambanc La Mesa Ltd. Partnership)*, 115 F.3d 650, 654 (9th Cir.1997) (plan must provide for payment of interest for the postconfirmation time value of the amount of unsecured creditor's claim); *In re Schriock Constr., Inc.*, 167 B.R. 569, 578 (Bankr.D.N.D.1994)("Simply put, the law in this area is well settled and requires that if the payments to the unsecured creditors are deferred over time, an appropriate discount rate, or rate of interest, must be afforded in order to compensate for the time value of money and pay the claimants the full value of their claims.") (citing *Steelcase, Inc. v. Johnston (In re Johnston)*, 140 B.R. 526, 529 (9th Cir.BAP1992), *aff'd* 21 F.3d 323 (9th Cir.1994)). Accordingly, the Partners must proceed under 11 U.S.C. § 1129(b)(2)(B)(ii) which describes fair and equitable in terms of the absolute priority rule. *See In re Montgomery Court Apartments of Ingham County, Ltd.*, 141 B.R. 324, 342 (Bankr.S.D.Ohio 1992).

■ "The absolute priority rule . . . requires that 'a dissenting class of unsecured creditors . . . be provided for in full before any junior class can receive or retain any property [under a reorganization] plan.'" *In re Haskell Dawes, Inc.*, 199 B.R. 867, 871 (Bankr.E.D.Pa.1996)(quoting *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202, 108 S.Ct. 963, 966, 99 L.Ed.2d 169 (1988), *on remand, Ahlers v. Norwest Bank Worthington (In re Ahlers)*, 844 F.2d 587 (8th Cir. 1988)). Because some of the equity holders in the instant case are retaining their interests in the debtor, it appears that the abso-

lute priority rule has been violated since Condor's unsecured claim is not being paid in full. The Partners assert, however, that their plan comes within an exception or corollary[30] to the absolute priority rule which permits former equity holders to retain or buy back their interests in the debtor, notwithstanding the fact that a senior class is not being paid in full, if the equity holders provide sufficient "new value" to the reorganized debtor. This new value exception was first recognized by the U.S. Supreme Court in *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939), *reh'g denied* 308 U.S. 637, 60 S.Ct. 258, 84 L.Ed. 529 (1939), which noted that at times, it is "essential to the success of the undertaking" for the debtor to seek new money from the present investors. *Id.*, 308 U.S. at 117, 60 S.Ct. at 8. "Where that necessity exists and the old [investors] make a fresh contribution and receive in return a participation reasonably equivalent to their contribution, no objection can be made." *In re Professional Dev. Corp.*, 133 B.R. 425, 426 (Bankr. W.D.Tenn.1991) (quoting *Case*, 308 U.S. at 121, 60 S.Ct. at 10.)

Although the courts and commentators disagree whether this new value exception survived the enactment of the 1978 Bankruptcy Code, *see, e.g., Survey of the New Value Exception to the Absolute Priority Rule and the Preliminary Problem of Classification*, SB37 ALl–ABA 595 (1997);

the Sixth Circuit Court of Appeals has recognized the exception's continued viability. *See In re Beaver Office Prods., Inc.*, 185 B.R. 537, 541 (Bankr.N.D.Ohio 1995) (citing *In re U.S. Truck Co.*, 800 F.2d at 588). Under *U.S. Truck*, equity holders may retain their interests in the debtor without paying senior creditors in full if the equity holders contribute additional capital which is (1) essential or necessary to the success of the reorganization; and (2) reasonably equivalent to the interests retained, a requirement which the Sixth Circuit characterized as "substantial." *In re U.S. Truck Co.*, 800 F.2d at 588; *see also In re Montgomery Court Apartments of Ingham County, Ltd.*, 141 B.R. at 342; *In re Aztec Co.*, 107 B.R. at 588. "A rigorous showing as to these requirements is necessary in order to ensure that a debtor's equity holders do not eviscerate the absolute priority rule by means of contrived infusion." *In re Sea Garden Motel and Apartments*, 195 B.R. at 301 (quoting *In re Tallahassee Assocs., L.P.*, 132 B.R. 712, 717 (Bankr.W.D.Pa. 1991)). Like other confirmation requirements, the burden of proving these new value elements lies with the plan proponent. *See, e.g., In re Montgomery Court Apartments of Ingham County, Ltd.*, 141 B.R. at 346.

Condor contends that the Partners failed to offer any evidence with respect to the substantiality component of the new value exception and, therefore, their burden of proof on this issue has not been met.[31]

**30.** Several courts have opined that the new value "exception" is not really an exception but is instead a "corollary" to the absolute priority rule because of the phrase "on account of" contained in § 1129(b)(2)(ii). Section 1129(b)(2)(ii) prohibits old investors from receiving an interest in the property of the bankruptcy estate "on account of" their prior ownership. These courts maintain that when a prior investor participates in the reorganized company because of a new equity contribution, the investor is not retaining or receiving an interest "on account of" its old interest, but is in essence purchasing a new interest. *See, e.g., Beal Bank v. Way Apartments, D.T. (In re Way Apartments, D.T.)*, 201 B.R. 444, 455 n. 13 (N.D.Tex.1996) and cases cited therein; *In re Haskell Dawes, Inc.*, 199 B.R. at 871 n. 12; *In re Creekside Landing, Ltd.*, 140 B.R. at 717. Regardless of whether the new value standard is an exception or corollary, the criteria for its application is one in the same.

**31.** Condor did not challenge the Partners' assertion that their contribution was necessary or essential to the success of the reorganization. Most courts seem to agree that the necessity requirement "is met if: (i) the contribution will be used to fund repairs or improvements to the debtor's property that are necessary to its reorganization; or (ii) the contribution is needed to enable the debtor to make payments due under the plan of reorganization and continue operating." *In re Haskell Dawes, Inc.*, 199 B.R. at 873–874 and cases cited therein. *See also In re Way Apartments, D.T.*, 201 B.R. at 456 (new capital necessary for the success of the plan where contribution needed for property to continue operating, to make the initial payments to creditors under the plan, and for maintenance); *In re Creekside Landing, Ltd.*, 140 B.R. at 717 (debtor has to prove that it cannot reorganize without new capital, new capital must be unavailable from any other source or old equity holders must be the most feasible source); *In re Aztec Co.*, 107 B.R. at 588 (necessity established by the fact that

Condor points out that Mr. Trent admitted that he had conducted no analysis to determine the value of what the contributing partners were receiving in exchange for their $170,000.00 capital investment. Condor offered the testimony of Andrew Higgins in this regard, who testified that in addition to the control aspect, there are three economic benefits which may be derived from owing an asset. The first is a cash on cash return, the second is the equity build-up you receive as the mortgage is repaid, and the third is asset appreciation. With respect to the Partners' plan, Mr. Higgins opined there appeared to be little prospect of any cash on cash return. He noted, however, that there should be $1.3 million in equity in the property at the end of the ten-year plan derived from repayment of Condor's secured debt without regard to income tax issues, for an average annual return of $130,000.00. In addition, assuming the debtor performs as the Partners project at annual increases in NOI of 2%, the apartment complex should appreciate by the end of the plan somewhere in the $3 million range, which if reduced to present value using a discount rate of 12% to 15% would be in the neighborhood of $1.2 million, or an annual return on appreciation of $120,000.00. Mr. Higgins opined that these returns would be extraordinary on a $170,000.00 investment, although admittedly they are noncash returns. He further acknowledged that he had indicated in his report that one can reasonably assume that over the next ten years the real estate and apartment market will suffer the downside of traditional economic cycles, with this happenstance being particularly more probable in the Kingsport market which has a relatively high concentration of employment.

Mr. Trent explained that the reason no analysis had been performed to determine the yield the Partners would receive on their investment was because of the difficulty in projecting a return over ten years. To support their assertion that their new equity contributions are reasonably equivalent to the value of their investment, the Partners point to the fact that the debtor's debts exceed the value of its assets by at least $1 million, that under the plan they have proposed there will be no return on their investment for at least ten years, and that even then a return is not guaranteed.

The Partners' position does have some support. In *SM 104*, the court suggested that balance sheet equity values be examined to determine reasonable equivalency and if there is no equity value, any contribution would be adequate. See *In re SM 104 Ltd.*, 160 B.R. at 202; *see also In re Waterville Valley Town Square Assocs.*, 208 B.R. 90, 100 (Bankr.D.N.H.1997) (court found contribution of 15% of property's value to be substantial and reasonably equivalent to partners' equity interest since no equity in debtor). This court, however, disagrees with such an approach. In the typical single asset case, there is rarely any equity because most courts fix the amount of the undersecured creditor's secured claim at the going concern value of the debtor's property, thereby leaving the reorganized entity fully encumbered. If equity value were the standard such that any contribution is sufficient, the reasonable equivalency requirement would be rendered a nullity in single asset cases, a result at odds with *U.S. Truck's* characterization of the test as one of substantiality, and in effect, the absolute priority rule would be abrogated. See *In re Greystone III Joint Venture*, 102 B.R. 560, 575 (Bankr.W.D.Tex.1989), *aff'd, Matter of Greystone III Joint Venture*, 127 B.R. 138 (W.D.Tex.1990), *rev'd on other grounds, Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (Matter of Greystone III Joint Venture)*, 948 F.2d 134 (5th Cir.1991),

debtor cannot continue to operate without new capital, many physical repairs cannot be accomplished from current revenues, and no sane outside investor would put new money in project given its physical condition, debt structure and the difficult rental market in which it competes).

In the present case, the new capital to be invested by the Partners will be used by the debtor to pay administrative expenses, one half of the unsecured trade debt and $100,000.00 to Condor. Mr. Trent testified that the Partners' contribution was necessary because the debtor had no other funds and no other source of capital. Mr. Trent also testified that efforts to refinance the Condor debt had been unsuccessful because lenders do not make 100% loans. Because this testimony was unrefuted, necessity was established.

as amended on petition for reh'g and suggestion for reh'g en banc 995 F.2d 1274 (1992), cert. denied 6 U.S. 821, 822, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992) (Purpose of equivalency requirement ensures that "equity holders will not eviscerate the absolute priority rule by means of gratuitous, token cash infusions proposed primarily to 'buy' cheap financing."). Furthermore, ownership has intrinsic value independent of the market value of the debtor's assets. See In re Creekside Landing, Ltd., 140 B.R. at 718 (citing Norwest Bank Worthington v. Ahlers, 485 U.S. at 207–208, 108 S.Ct. at 969 (rejecting argument that ownership of entity with no net worth and minimal going concern is worthless)).

The generally accepted method for determining the value of equity interests in the reorganized debtor is the capitalization of future earnings approach.[32] See In re Haskell Dawes, Inc., 199 B.R. at 878; In re Beaver Office Prods., Inc., 185 B.R. at 543; In re Creekside Landing, Ltd., 140 B.R. at 718 (citing Muskegon Motor Stockholders

Protective Comm. v. Davis (Matter of Muskegon Motor Specialties), 366 F.2d 522 (6th Cir.1966) ("earning capacity, the capitalization of future profits, is the appropriate method of valuation")). "The likelihood of return on the new investment and probable future risks must be considered." Id. (citing Ahlers, 485 U.S. at 207–208, 108 S.Ct. at 969; In re U.S. Truck Co., 800 F.2d at 588.) "The likelihood of future increases in the value of assets also is relevant." Id.

While the Partners have presented projections as to the debtor's future earnings, they have failed to present the court with sufficient evidence to calculate the capitalized value of those future earnings. The court recognizes the difficulty of establishing this value, but the difficulty does not alleviate the requirement that the valuation be performed in order to prove equivalency. In the absence of this evidence, the court must find against the Partners on this issue. See In re Graphic Communications, Inc., 200 B.R. at 150–51 (because debtor offered no evidence of its postreorganization value, court was un-

**32.** Another simpler method used by the courts to determine reasonably equivalent value involves comparing the amount of the new value contribution with the value of the property. See, e.g., Survey of the New Value Exception to the Absolute Priority Rule and the Preliminary Problem of Classification, SB37 ALI–ABA 595, 658 (1997). The Partners' proposed contribution of $170,-000.00 is 2% of the debtor's value of $8.2 million. Comparing these numbers with new capital contributions and valuations in other chapter 11 reorganizations, it is highly questionable whether the Partners' new investment would be considered substantial. Compare In re Waterville Valley Town Square Assocs., 208 B.R. at 100 (contribution of 15% of property's value was both substantial and reasonably equivalent); In re Way Apartments, D.T., 201 B.R. at 456 (new value contribution of $150,000.00 sufficient where property worth $2.15 million); In re Duval Manor Assocs., 191 B.R. at 636 ($100,000.00 investment met new value standard on property with value of $3.45 million); In re HRC Joint Venture, 187 B.R. 202, 211 (Bankr.S.D.Ohio 1995)($1.3 million contribution sufficient on property worth $23 million); State St. Bank and Trust Co. v. Elmwood, Inc. (In re Elmwood, Inc.), 182 B.R. 845, 853 (D.Nev.1995) ($150,000.00 contribution sufficient on property worth $1.5 million); Te–Two Estate Ltd. Partnership v. Creekstone Apartments Assocs., L.P., (In re Creekstone Apartments Assocs., L.P.), 1995 WL 588904 at *14–15 (M.D.Tenn.1995)($350,000.00 contribution reasonably equivalent to debtor worth $7.6 million); In re Aztec Co., 107 B.R. at 588 ($500,-

000.00 new capital sufficient on property worth $1.7 million); with In re Grandfather Mountain Ltd. Partnership, 207 B.R. at 493 (substantial disparity between the $360,000.000 contribution and the $4.9 million value of shopping center raised serious question regarding the applicability of the new value exception); In re Economy Lodging Sys., Inc. 205 B.R. 862, 868 (Bankr. N.D.Ohio 1997) (although $160,000.00 contribution was substantial, proponent failed to establish equivalency where property was worth $6.1 million); In re Wynnefield Manor Assocs., L.P., 163 B.R. 53, 59 (Bankr.E.D.Pa.1993)(contribution equivalent to only 4.2% of the value of the property did not satisfy the reasonably equivalent requirement); In re One Times Square Assocs. Ltd. Partnership, 159 B.R. 695, 708 (Bankr. S.D.N.Y.1993), aff'd, One Times Square Assocs. Ltd. Partnership v. Banque Nationale de Paris (In re One Times Square Assocs. Ltd. Partnership), 165 B.R. 773 (S.D.N.Y.1994), aff'd, In re One Times Square Assocs., 41 F.3d 1502 (2d Cir. 1994), cert. denied, One Times Square Assocs. Ltd. Partnership v. Banque Nationale de Paris, 513 U.S. 1153, 115 S.Ct. 1107, 130 L.Ed.2d 1072 (1995)(new value exception not applicable where the contribution was $2.4 million and the value of the retained asset was $19 million); In re Miami Ctr. Assocs., Ltd., 144 B.R. 937, 942 (Bankr.S.D.Fla.1992)(contribution of $2 million not sufficient for property with value of $18.5 million).

able to compare new capital contribution to value of interest received in exchange); *In re Haskell Dawes, Inc.*, 199 B.R. at 879 (failure of debtor to carry its burden of establishing going concern value prevented equivalency finding); *In re Beaver Office Prods., Inc.*, 185 B.R. at 543 (court could not conclude that shareholders' proposed contribution was reasonably equivalent to interest being retained where debtor failed to present the court with sufficient evidence to calculate the capitalized value of its future earnings); *In re S.A.B.T.C. Townhouse Ass'n, Inc.*, 152 B.R. 1005, 1011 (Bankr.M.D.Fla.1993) (confirmation denied where the debtor failed to prove that new value was reasonable equivalent of interest being received; debtor failed to provide any information regarding the aggregate value of the equity holders' retained interest in the reorganized entity, as well as any evidence of reorganization value); *In re Montgomery Court Apartments of Ingham County, Ltd.*, 141 B.R. at 345–346 (failure of debtor to produce any evidence at the confirmation hearing of reorganization value prevented reasonable equivalency finding). Accordingly, the court will sustain Condor's objection to confirmation with respect to the fair and equitable requirement for unsecured creditors found in 11 U.S.C. § 1129(b)(2)(B)(ii).

### H. Good Faith

Condor's final objection to confirmation of the Partners' plan is that it has not been proposed in good faith as required by § 1129(a)(3).[33] Condor points to all the objections to the Partners' plan which it has raised as evidence of the overall bad faith by the Partners in proposing the plan, including the fact that one of the partners, Walter Trent, will be receiving an 85% interest in the debtor in return for what Condor describes as a "relatively small investment."[34] Condor also charges that "the Partners have engaged in multiple abuses of the bankruptcy system including gerrymandering of votes and artificial impairment of claims" and have "breached their own fiduciary and contractu-

al obligations" to the debtor by failing to provide deficit funding as previously agreed. Condor is referring to the fact that three general partners, including the two plan proponents, failed to fund the debtor's 1989 operating deficit even though the debtor paid these general partners a $175,000.00 fee in return for their agreement to fund the debtor's operating deficits for a period of time through 1989.

The Partners deny Condor's charges and respond that they have met the good faith standard which requires a plan proponent to exercise fundamental fairness in dealing with creditors in the plan. The Partners note that they disclose in their third amended disclosure statement Condor's assertions against them, that their plan does not release any claims which the debtor may have against them, although offset rights are preserved, and that their claims against the debtor are subordinated to payment in full of Condor's unsecured deficiency claim. The Partners contend that for these reasons, along with the fact that their plan provides for payment of all claims, the retention by the debtor of ownership of its assets, and participation of all equity holders in the new equity fund, their plan has been proposed in good faith.

"Good faith is determined based on the 'totality of circumstances' and in light of the Bankruptcy Code's purpose to provide debtors with a fresh start." *In re Rivers End Apartments, Ltd.*, 167 B.R. at 475 (citing *B.M. Brite v. Sun Country Dev., Inc. (Matter of Sun Country Dev., Inc.)*, 764 F.2d 406, 408 (5th Cir.1985)). "A plan is proposed in good faith if its result is 'consistent with the objectives and purposes of the Code.'" *Id.* at 476 (citing *Stolrow v. Stolrow's, Inc. (In re Stolrow's, Inc.)*, 84 B.R. 167, 172 (9th Cir.BAP1988)). This court does not find that the Partners' plan was proposed in bad faith. Condor's charge that the Partners have engaged in multiple abuses of the bankruptcy

---

**33.** Subsection (a)(3) of 11 U.S.C. § 1129 provides that "[t]he court shall confirm a plan only if ... the plan has been proposed in good faith and not by any means forbidden by law."

**34.** Because only six of the equity security holders chose to contribute and participate in the new equity fund, the bulk of the $170,000.00 equity fund, or $144,467.90, was funded by Walter Trent.

system by reason of the artificial impairment of the unsecured trade debt and gerrymandering of classes is without merit as the court noted that Condor's objections based on these arguments will be overruled. Although the Partners' failure to cover the debtor's operating deficits in all probability contributed to the necessity of the debtor's bankruptcy filing, the Partners' prefiling conduct has more to do with the question of whether this chapter 11 case was filed in good faith than the issue of whether the Partners' plan has been proposed in good faith. *See Matter of Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir.1984)(district court erroneously construed § 1129(a)(3) when it evaluated the prefiling conduct of the debtor as well as the feasibility of the plan itself); *Bank of America, Illinois v. 203 N. LaSalle St. Partnership*, 195 B.R. 692, 702 (N.D.Ill. 1996) (court refused to consider the motive of the debtor or its partners in filing their chapter 11 petition in determining whether plan fulfilled the good faith requirement for confirmation). The court is satisfied that the Partners have proposed their plan with a legitimate rehabilitative purpose. Accordingly, the objection to confirmation based on an alleged lack of good faith will be overruled.

## VI. OBJECTIONS TO CONDOR'S PLAN

■ The Partners contend that Condor's third amended plan fails to comply with § 1129(a)(1) because it allegedly improperly classifies the Partners' unsecured claims in *Class 3* instead of in *Class 1* with the debtor's unsecured trade claims in violation of § 1122. The Partners' unsecured claims arise from insider loans made to the debtor and are not substantially similar to the debtors' unsecured trade claims which arose from goods and services being provided to the debtor upon credit. More important, the Partners do not dispute Condor's contention that the unsecured insider claims are required to be treated differently as those claims are contractually subordinated to trade debt by virtue of their partnership agreement. In light of the fact that the Partners' claims in *Class 3* are contractually subordinated to the trade debt in *Class 1*, Condor may classify the obligations separately. *See In re Micro–*

*Acoustics Corp.*, 34 B.R. 279 (Bankr.S.D.N.Y. 1983) (shareholder's stock repurchase claim could be separately classified from that of other unsecured creditors); *In re U.S. Truck Co.*, 800 F.2d at 586 (§ 1122 gives the courts broad discretion to determine proper classification according to the factual circumstances of each individual case). Partners' counsel also acknowledged during closing arguments that had the insider claims in *Class 3* been placed in *Class 1*, the votes on the insider claims would not have been counted for the purposes of determining whether an impaired class accepted Condor's plan and because *Class 1* voted against Condor's plan, the separate classification had no significant effect.

■ Another objection by the Partners is that Condor's plan allegedly violates 11 U.S.C. § 1123(a)(2) because Condor's allowed secured claim is not designated as being unimpaired. The Partners contend that Condor's allowed secured claim is unimpaired because all of Condor's collateral is being transferred to it. To the contrary, however, Condor will not be receiving all of its collateral. Condor's third amended plan provides that approximately $100,000.00 of its cash collateral will be used to pay administrative expenses and pre and postpetition trade debt. Accordingly, the Partners' objection in this regard is without merit. The court having concluded that Condor's claim in *Class 2* is impaired, the Partners' related contention that Condor's plan does not comply with § 1129(a)(10) which requires acceptance of the plan by an impaired class is likewise without merit.

The Partners also assert that the Partners and the other unsecured creditors would receive more in a chapter 7 than under Condor's plan in contravention of the best interests of creditors requirement of § 1129(a)(7)(A). They note that under Condor's plan, Condor is receiving certain personalty valued at $40,000.00 even though it may not have a lien on the personalty and that this property would be available to unsecured creditors in a chapter 7 case. Condor having stipulated that it will amend its plan to provide a mechanism for paying the value of the property or selling those items so that

any benefit therefrom will be preserved for the bankruptcy estate in the event the lien on the personalty is avoided, this objection is rendered moot.

Somewhat related is the Partners' objection that Condor's third amended plan allows Condor's claim to the full extent of the prepetition amount rather than at the value of the property and otherwise does not take into account the postpetition payments by the debtor. Counsel for Condor explained that the amount of its allowed claim was listed as being $10.8 million because the cash collateral order did not address how the payments made to Condor during the pendency of this case were to be applied and explained that this is not really an issue since Condor is not receiving anything other than its collateral. To address this objection, Condor's counsel suggested that Condor be allowed to amend its plan to state that its claim is allowed based on the value of the assets transferred under the plan. The court will allow Condor to make this amendment so as to moot this objection.

█ The Partners' assertion that Condor's third amended plan was not proposed in good faith as required by § 1129(a)(3) because Condor attempted to purchase unsecured trade claims in order to prevent consideration of the Partners' plan must also be overruled. The court previously considered this issue in denying the Partners' motion to disqualify and designate as not having been cast in good faith the ballots of the four unsecured trade claims which Condor had purchased and voted against the Partners' third amended plan. *See In re Crosscreek Apartments, Ltd.*, 211 B.R. 641 (Bankr. E.D.Tenn.1997). Citing the recent opinion from the Sixth Circuit Court of Appeals, *255 Park Plaza Assoc. Ltd. Partnership v. Connecticut Gen. Life Ins. Co. (In re 255 Park Plaza Assoc. Ltd. Partnership)*, 100 F.3d 1214 (6th Cir.1996), this court concluded that Condor's offer to purchase all of the unsecured trade claims for 100% full value in and of itself did not indicate bad faith. No evidence of bad faith in attempting to purchase the Unsecured trade claims having otherwise been presented by the Partners, the objection is meritless.

█ The Partners also argue that because Condor was denied relief from the stay, its third amended plan is actually an attempt to circumvent 11 U.S.C. § 362(d) to obtain its collateral and, therefore, its plan has not been proposed in good faith. The court disagrees. When Condor was denied relief from the stay, it was because the debtor was still within its exclusivity period and the debtor was given the benefit of the doubt as to whether it could propose a confirmable plan. That is no longer the case. In any event, the mere fact that Condor was denied relief from the stay in the early stage of this case presents no evidence that its present liquidation plan is proposed in bad faith. Accordingly, the Partners' objection in this regard will likewise be overruled.

The Partners' remaining objection is that Condor's plan is not fair and equitable as required by § 1129(b)(1) and (2) because equity holders in *Class 3* may retain their interests while the Partners' claims in *Class 4* will receive nothing, the plan forces the debtor to cease operations, and the plan does not expose the property to the market for interested parties to purchase. Under Condor's plan, Condor will seek to have the *Class 3* claims of the insiders, Walter Trent, Lynwood Willis and Bruce Grewell, general partners of the debtor, subordinated to the *Class 1* claims of the trade creditors based upon contractual or equitable subordination. If the *Class 3* claims are disallowed or subordinated, the general partners will receive no distribution. If the *Class 3* claims are allowed and not subordinated, they will share *pro rata* with *Class 1* claims in the funds which would have been used to pay the *Class 1* claims in full. The equity holders of the debtor included in *Class 4* will retain their interests in the debtor unless *Class 3* claims are allowed and not subordinated, resulting in unsecured claims being paid less than in full, in which event *Class 4* interests will be extinguished. The Partners contend that if the claims in *Class 3* are allowed and subordinated, the equity holders in *Class 4* would retain their interests even though *Class 3* claims will not be paid. Condor's counsel responded that the intent of the plan is for *Class 4* interests to be extinguished if unse-

cured creditors will be paid less than in full under any scenario, and that if this is not clear, Condor will amend its plan in whatever manner is necessary. Because it does appear that Condor's plan as presently proposed does not expressly provide for extinguishment of the *Class 4* interests in the event the *Class 3* claims are allowed and subordinated, the plan will need to be amended to comply with the absolute priority requirement. One solution would be to include a provision that *Class 4* equity holders will have their interests extinguished if *Class 3* claims are allowed and subordinated, or extinguish all interests other than those of the Partners, who may collectively elect to retain their partnership interests. In either of those two events, the absolute priority rule will be satisfied. Of course if *Class 3* claims are either allowed and not subordinated or disallowed, the plan as it presently exists satisfies the absolute priority rule.

The Partners' remaining argument that Condor's third amended plan is not fair and equitable because the debtors' operations will cease and the apartment complex is not being exposed to the market is frivolous. Simply because the debtors' operations will cease under Condor's plan does not mean it is unfair or inequitable. Moreover, no evidence in this regard was offered to establish such a proposition. And as for the Partners' argument that Condor's plan should provide for the apartment complex to be put on the market to bring the best price, the debtors' loan is nonrecourse and the equity holders are not placed at a disadvantage by the transfer of the apartment complex under the plan. Without offering any evidence that an auction of the apartment complex would result in payment of more than the indebtedness owed to Condor, this objection is without grounds.

## VII. CONCLUSION

The foregoing constitutes the court's findings of facts and conclusions of law pursuant to Fed.R.Civ.P. 52(a), as incorporated by Fed. R. Bankr.P. 7052. An order to this effect will be entered contemporaneously with the filing of this memorandum opinion. That order will provide Condor an opportunity to file a fourth amended plan containing the modifications which Condor's counsel stipulated that Condor would make as referenced herein and any additional provisions that must be included to obtain confirmation in accordance with *Section VI* of this memorandum opinion.